## MISSISSIPPI RAILROAD COMMISSION ET AL. v. MOBILE & OHIO RAILROAD COMPANY.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF MISSISSIPPI.

No. 256.  Submitted May 1, 1917.—Decided June 4, 1917.

While the power of the States over the railways within their borders is very great and comprehensive, the property of the railways is nevertheless protected by the fundamental guaranties of the Constitution, is entitled to as full protection as any other private property devoted to a public use, and can not be taken from its owners without just compensation or without due process of law.

An attempt upon the part of a state commission to exercise the power of regulation in such an arbitrary and unreasonable manner as to prevent a railroad company from obtaining a fair return upon its property invested in the public service is repugnant to due process of law and void under the Fourteenth Amendment.

Upon the facts of this case, *Held* that an order of the Mississippi Railroad Commission, requiring the appellee company to restore certain passenger trains to service on its line within that State, was arbitrary, unreasonable, in excess of the lawful powers of the commission, and void under the due process clause of the Fourteenth Amendment.

The reasonableness of requiring a carrier to operate specified trains can not be made to depend upon the relation of the money return to the "out-of-pocket" cost, i. e., immediate outlay for wages and fuel, involved in their operation. *Northern Pacific Ry. Co.* v. *North Dakota*, 236 U. S. 585.

The action of the Railroad Commission in this case, though expressed in a separate order as to each train directed to be restored, was based upon one citation and was intended by the commission, and treated by the court below, as in effect but one order for the restoration of all the trains; this court therefore treats it as a unity, without determining whether some improvement of the train service might not properly have been required.

Affirmed.

THE case is stated in the opinion.

*Mr. James N. Flowers* and *Mr. George H. Ethridge*, Assistant Attorney General of the State of Mississippi, for appellants.

*Mr. S. R. Prince* and *Mr. Carl Fox* for appellee.

MR. JUSTICE CLARKE delivered the opinion of the court.

This is a direct appeal from an order of the District Court for the Southern District of Mississippi, three judges sitting, granting an interlocutory injunction restraining the Mississippi Railroad Commission and the Attorney General of that State from enforcing six separate orders entered by the commission on one citation in one case on October 7, 1914, requiring the appellee to

restore to service six passenger trains—two each way daily between Meridian and Waynesboro, a town fifty-two miles to the south, and one train each way daily between Meridian and Okolona, a town one hundred and twenty-seven miles to the north—all in the State of Mississippi. The trains between Meridian and Okolona which were discontinued were interstate trains, the others were local to the State.

The appellee averred several grounds for the injunction prayed for, but the conclusion which we have reached calls upon us to consider only one of them, viz:

That the depression of business incident to the European War had so reduced the income of the railroad company that at the time the order was entered it was less than its current expenses; that a large loss would be incurred in operating each of the six trains; that without these trains there remained reasonably adequate service having regard to the population of the territory involved, and that the general financial condition of the company was such that the order if enforced would deprive the company of its property without due process of law and of the equal protection of the laws, in violation of the Fourteenth Amendment to the Constitution of the United States.

The principles of law applicable to the decision of such a case as this record presents are few and they have become so settled and so familiar by repeated decisions of this court that extended discussion of them would be superfluous. They are these:

A State may regulate the conduct of railways within its borders, either directly or through a body charged with the duty and invested with powers requisite to accomplish such regulation. *Mississippi Railroad Commission* v. *Illinois Central R. R. Co.*, 203 U. S. 335; *Prentis* v. *Atlantic Coast Line R. R. Co.*, 211 U. S. 210; *Louisville & Nashville R. R. Co.* v. *Garrett*, 231 U. S. 298.

Under this power of regulation a State may require

carriers to provide reasonable and adequate facilities to serve not only the local necessities but the local convenience of the communities to which they are directly tributary. *Lake Shore & Michigan Southern Ry. Co.* v. *Ohio,* 173 U. S. 285; *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* v. *Illinois,* 177 U. S. 514; *Atlantic Coast Line R. R. Co.* v. *North Carolina Corporation Commission,* 206 U. S. 1; *Missouri Pacific Ry. Co.* v. *Kansas,* 216 U. S. 262; *Chicago, Burlington & Quincy R. R. Co.* v. *Railroad Commission of Wisconsin,* 237 U. S. 220; and such regulation may extend in a proper case to requiring the running of trains in addition to those provided by the carrier, even where this may involve some pecuniary loss, *Atlantic Coast Line R. R. Co.* v. *North Carolina Corporation Commission, supra,* and *Missouri Pacific Ry. Co.* v. *Kansas, supra.*

But, while the scope of this power of regulation over carriers is very great and comprehensive, the property which is invested in the railways of the country is nevertheless under the protection of the fundamental guaranties of the Constitution and is entitled to as full protection of the law as any other private property devoted to a public use, and it cannot be taken from its owners without just compensation or without due process of law. *Wisconsin, Minnesota & Pacific R. R.* v. *Jacobson,* 179 U. S. 287; *Atlantic Coast Line R. R. Co.* v. *North Carolina Corporation Commission,* 206 U. S. 1; *Northern Pacific Ry. Co.* v. *North Dakota,* 236 U. S. 585; *Chicago, Milwaukee & St. Paul R. R. Co.* v. *Wisconsin,* 238 U. S. 491.

If this power of regulation is exercised in such an arbitrary or unreasonable manner as to prevent the company from obtaining a fair return upon the property invested in the public service it passes beyond lawful bounds, and such action is void, because repugnant to the due process of law provision of the Fourteenth Amendment to the Constitution of the United States. *Atlantic Coast Line R. R. Co.*

v. *North Carolina Corporation Commission*, 206 U. S. 1; *Missouri Pacific Ry. Co.* v. *Nebraska*, 217 U. S. 196; *Missouri Pacific Ry. Co.* v. *Tucker*, 230 U. S. 340; *Northern Pacific Ry. Co.* v. *North Dakota*, 236 U. S. 585.

Whether a statute enacted by the legislature of a State or an order passed by a railroad commission exceeds the bounds which the law thus sets to such authority is a question of law arising on the facts of each case (*Mississippi Railroad Commission* v. *Illinois Central R. R. Co.*, *supra*), and the appropriate remedy for determining that question is a bill in equity such as was filed in this case to enjoin its enforcement. *Mississippi Railroad Commission* v. *Illinois Central R. R. Co.*, *supra*; *Chicago, Milwaukee & St. Paul R. R. Co.* v. *Wisconsin*, *supra*.

With these principles in mind we pass to a consideration of the question of law which the facts of this particular case present for our decision.

The case was heard on bill, answer and testimony which are all before us, and the facts appearing may be summarized as follows:

The Mobile & Ohio Railroad Company is an interstate carrier operating a line of railway from Mobile, Alabama, to St. Louis, Missouri. This evidence is uncontradicted: That the company is not overcapitalized, that it has been wisely and economically managed and that, nevertheless, its net earnings above the cost of operation, fixed charges and taxes, and before making any allowance for betterments or for dividends, were only $85,000 for the year ending June 30, 1914. It never paid a greater dividend than five per cent. and this for only a few years in its history; in the month of July, 1914, on its entire system the company earned a surplus over fixed charges and taxes of $11,000; in the month of August it showed a deficit of $25,641, and in September the deficit became $113,627,— this without making any deduction for betterments, or improvements or dividends.

The trains ordered restored were numbered 7, 8, 9, 10, 11 and 12, and they were all put into operation by the defendant railroad company as experiments from time to time within a few years prior to 1914 without any order of the commission, in the hope of building up passenger business, but the record shows that not one of them at any time paid the cost of operation.

The territory under consideration is sparsely settled and the chief traffic of the company is lumber and cotton and the resulting general freight due to a marketing of these commodities. The depression in these staples was very great prior to and at the time the case was heard.

The uncontradicted testimony of the auditor of the company shows that the passenger revenue per train mile, of the trains ordered restored, for the three months next before the passing of the order was: For July, 65 cents, for August, 64 cents and for September, 56 cents; that the average passenger revenue per train mile of trains 7, 8, 9 and 10 from October 1st to October 5th (the next day but one before the order was passed), was 36 cents, and that of trains 11 and 12 for the same six days was 25 cents.

The auditor also testifies that as near an approximation as could be arrived at showed the total revenue of the company derived from passenger traffic for the two months ending August 31, 1914, was $331,102.85, and that the total expenses and taxes allotted to this service amounted to $339,247.60, making the passenger revenue per train mile .9708 and that the expenses and taxes per train mile amounted to .9944, or a net loss per passenger train mile of .0236.

The secretary of the company testified that on September 30, 1914, the company had a working balance of $74,885.79 and that there were unpaid vouchers amounting to $1,027,319, some of which dated as far back as November of the preceding year; that these vouchers did not represent any fixed charges or any interest, and that

the normal amount of approved unpaid vouchers was between $400,000 and $500,000.

The evidence further shows that in order to avoid insolvency the company had reduced expenses in many ways, including even the expense of repairs to locomotives and cars of every description; that the president and vice-president had voluntarily submitted to a reduction of twenty per cent. in their salaries, and that the salaries of all the other officers had been reduced on a sliding scale up to ten per cent.

The falling off in earnings for the first 17 days in October as compared with the preceding year was $165,742, or approximately $10,000 a day, and the estimated saving to the company of the taking off of the six trains involved in this controversy was $10,000 a month.

The company introduced in evidence sixty-one affidavits from what is claimed to be substantially all of the important business men in the towns which would be most affected by the taking off of the trains, who agree in saying that, while these trains were a convenience to the traveling public, owing to business conditions then prevailing there was not much travel and would not be until the trade depression was over; that the taking off of the trains would not materially injure the business of the various towns in which they lived, and that if the trains were losing money and the total business of the company was not profitable, in their judgment the company should be allowed to discontinue them.

The territory between Meridian and Waynesboro is not a productive agricultural section, and in the fifty-two miles between the two towns there are five "fair sized towns" and five small villages, which, according to the 1910 census, had a population of only 5,456, and there is no evidence that the population had increased up to the time of trial.

The service which remained between Meridian and

Waynesboro to the south, after these trains were taken off, consisted of two trains each way each twenty-four hours, and between Meridian and Okolona there remained three trains each way every twenty-four hours.

All of the trains which were continued were through interstate trains, which, while the local trains were being run, made very few stops, but when the local trains were taken off each of these trains made all the stops between Waynesboro, Meridian and Okolona, with the result that, whereas, formerly train No. 4, for example, made seven stops between Meridian and Okolona, under the new schedule it made twenty-two.

The evidence on which the Railroad Commission acted is summarized in the record and it is impressively meager in extent and inadequate in character. It consists of the testimony of two men, wholly without qualifying training or experience, as to the cost of operating such trains and of a number of men as to the inconvenience which would be caused by the taking off of the trains, chiefly to commercial travelers living in Meridian desiring to visit the small villages and hamlets on the line. The testimony of the one member of the commission who appeared as a witness shows that the reasonableness of the order was made to turn on what the commission estimated was the "out of pocket" cost, the immediate cash outlay in wages and fuel, of operating the six trains. But this cannot be accepted as a proper basis for determining such cost. *Northern Pacific Ry. Co.* v. *North Dakota*, 236 U. S. 585, 594, 596.

Thus summarized this evidence shows that the plaintiff railroad company, an important interstate carrier, was operating before the business depression incident to the war on a margin so narrow that the $85,000 of profit for the entire preceding year would have been more than swallowed up in nine days by the shrinkage of business of the company as it was when this controversy arose; that

without being able to meet its growing deficit the company had resorted to rigid economies of every sort before it discontinued these six trains the continued operation of which would have involved a loss of $10,000 a month; that the three daily trains each way to the north of Meridian which remained after the taking off of the trains which gave rise to the controversy cannot be said to be inadequate to the needs of the comparatively small population to be served, and that while the service to the south of Meridian—with but two trains each way, in twenty-four hours, and these running at hours inconvenient for the transaction of business—cannot be thought a liberal service, yet these orders were intended by the commission to be in effect one order for the restoration of the six trains, they were thus treated in the court below and must be so treated here. Looking to the extent and productiveness of the business of the company as a whole, the small traveling population to be served, the character and large expense of the service required by this order, and to the serious financial conditions confronting the carrier, with the public loss and inconvenience which its financial failure would entail, we fully agree with the District Court in concluding that the order of the commission at the time and under the circumstances when it was issued was arbitrary and unreasonable and in excess of the lawful powers of the commission, and that if enforced it would result in such depriving of the railroad company of its property without due process of law as is forbidden by the Fourteenth Amendment to the Constitution of the United States. The order of the District Court granting the injunction must be

*Affirmed.*