## GREAT NORTHERN RY. CO. v. NAGLE, Atty. Gen., et al.
### No. 3010.

District Court, D. Montana.
Oct. 1, 1936.

Weir, Clift, Glover & Bennett, of Helena, Mont., for plaintiff.

A. H. Angstman, of Helena, Mont., C. E. Baker and J. E. McKenna, both of Lewistown, Mont., and H. O. Vralsted, of Stanford, Mont., for defendants.

Before HANEY, Circuit Judge, and WEBSTER and PRAY, District Judges.

PRAY, District Judge.

This is a suit to enjoin the Board of Railroad Commissioners of the State of Montana from enforcing its orders to continue the operation of certain trains of the plaintiff corporation in the aforesaid state. The hearing herein is on the application of plaintiff for an interlocutory injunction. The trains affected by the orders of said board are as follows: Passenger trains numbered 237 and 238 running between Great Falls and Butte, a distance of 170 miles; passenger trains numbered 239 and 240 between Great Falls and Lewistown, a distance of 111 miles; and passenger trains numbered 41 and 42 between Shelby and Sweet Grass, a distance of 39 miles. The plaintiff operates a line of railroad from St. Paul, Minn., to Seattle, Wash., through the states of North Dakota, Montana, and Idaho, and the foregoing passenger trains are operated on its branch lines in Montana.

That bus lines operate daily, each way, between the points above named, and parallel the railroad from Great Falls to Butte and nearly so from Great Falls to Lewistown and from Shelby to Sweet Grass. That between Great Falls and Butte two bus lines operate six schedules each way daily, and that between those points plaintiff operates two passenger trains each way daily; and that in addition to trains 239 and 240 between Great Falls and Lewistown, plaintiff operates a passenger train each way daily, and the Milwaukee Railroad operates one passenger train each way daily and one mixed train each way daily except Saturday. Plaintiff further calls attention to the fact that in addition to the transportation service furnished by the railroads, there are 149,240 motor vehicles registered in Montana, of which 35,492 are trucks and busses; that there are four truck lines operating on a daily schedule between Great Falls and Butte, an additional line between Butte and Helena, and forty-three other persons and corporations licensed to operate trucks on parts of the highway tributary to Great Falls, Helena, Boulder, and Butte; that there are two lines of common carrier trucks operating between Shelby and Sweet Grass, and ten other persons and corporations licensed to operate in the territory tributary to Shelby and Sweet Grass; that there are three lines of licensed commercial trucks operating between Great Falls and Lewistown, and twenty-four other persons and corporations licensed to operate trucks over that part of the highway tributary to Great Falls, Lewistown, Belt, and Hobson.

Plaintiff then shows that for a seven months' period beginning January 1, 1935, the average number of passengers carried on trains 237 and 238 was 44, or 22 per train. That the total revenue for the two trains for that period was $25,895, and that the actual cost of operating the two trains was $41,111.00, and that the indirect costs, if added, would disclose a loss of $57,050. That on account of the improved highways, the short-haul business in passenger transportation, express, and milk, has gone largely to private automobiles, commercial trucks, and busses. That on trains 41 and 42 for a five months' period ending October 31, 1935, the average number of passengers carried was nine, or four and one-half per train. That the total revenue for these two trains for that period was $2,806, and the actual cost of operation was $7,319, or an actual loss of $4,513, and that if indirect costs were added the loss would have been $11,792.

That for seven months ending July 31, 1935, the average number of passengers carried on trains numbered 239 and 240 was 29, or 14½ per train. That the total revenue for the two trains for this period was $10,305; the actual cost of operation was $20,411.00, or a loss of $10,106; and that if indirect costs were included the loss would have been $33,239.

That because of business losses, as above indicated, plaintiff's total income from all sources during the years 1932, 1933, and 1934 so diminished that it was unable to meet its expenses, including interest and fixed charges by $13,405,000 in 1932, $3,186,000 in 1933, and $1,074,000 in 1934, and that for the first nine months of 1935 it had available for dividends approximately $1,425,000. That plaintiff has 2,500,000 shares of stock issued of a par value of $250,000,000. That in the years 1932 to 1934, with rigid economy, it has failed to earn a reasonable or fair return upon the value of its property used for railroad purposes. As determined by the Interstate Commerce Commission the return in those years was as follows: 1932, 0.22 per cent.; 1933, 1.96 per cent.; 1934, 2.34 per cent. That plaintiff's total system revenue from passenger fares in 1925 was $13,955,000; that a steady decrease is shown each year down to 1934 of $4,220,000, or decrease of 70 per cent. That the total revenue from passenger fares in Montana has decreased $3,272,000 in 1925 to $1,202,000 in 1934, or 63 per cent., and that includes both intra-state and interstate business. That the total revenue passengers on plaintiff's system has decreased from 3,642,749 in 1925 to 1,244,819 in 1934, or 65 per cent.; and the decrease in Montana has been from 760,886 in 1925 to 340,149 in 1934, or 55 per cent. That on plaintiff's system there has been a decrease in total revenue of passenger trains from 1925 to 1934, of 60 per cent., and a like decrease in Montana of 53 per cent. That in 1934 the loss from operation of its passenger trains on the entire system was $4,336,000, and the loss in Montana for that year was $908,000, and a substantially similar loss for 1935 at time of filing complaint.

Plaintiff claims that to continue the operation of these trains will result in great loss in the maintenance of a service the public does not use, and that such loss is an unreasonable burden on interstate commerce. The discontinuance of these train services under Montana law requires an order of the Board of Railroad Commissioners. That plaintiff's petition for a discontinuance of said six trains was heard by said board and denied. The foregoing statement appears to be a fair synopsis of the affidavits submitted in support of plaintiff's complaint and application for interlocutory injunction. No counter affidavits were filed by defendants, and the claims made in their briefs rest upon the allegations of their answer which was verified. Counsel for defendants suggested the use of the transcript of the evidence taken at the hearing before the board, but counsel for plaintiff did not deem it necessary. It was intimated by the court that such a course might be adopted providing counsel for the respective parties could agree on the correctness of the transcript. No further steps have been taken in that direction. With this source of information at hand, it seems probable that defendants readily could have procured counter affidavits for the further information of the court.

As to the question of jurisdiction it does not appear that a serious issue has been raised. Undoubtedly the court is exercising a judicial function in reviewing the action of the board under section 3809 of the Montana Codes. It seems to be the settled rule that, if the review of the order is judicial in character, federal courts may have jurisdiction. Section 380, U.S.C.A., title 28; also, Johnson Act, section 41, 28 U.S.C.A., which the court holds has no application to this case.

At the outset of our deliberations we are confronted with the query whether we have before us sufficient evidence to pass upon the application for injunctive relief which comprehends the principal issues involved in the case. The evidence before us is found in the affidavits of plaintiff and admissions in the answer of certain pertinent allegations of the complaint, such as losses in branch line service through nonuse by the public; extent of bus service and train service; increasing loss, over a long period of time, of patronage and its transfer to busses, paralleling the lines of railroad; board's allowance of six busses daily each way between Butte and Great Falls, on its finding presumably that public necessity and convenience required it. As to service between Great Falls and Lewistown and Shelby and Sweet Grass, the busses also parallel the railroads, except that certain small towns served by the railroads are not served by the busses, and that on the Shelby-Sweet Grass line the discontinuance of the train would leave no passenger train service between those points. That the public generally does not use these trains seems to be conceded. Aside from that, the court probably should take notice that the bulk of branch line passenger train patronage, including the entire system as well, has gone from the railroads to the highways; with constantly increasing travel by air; and that is generally understood to apply to other railroads. However, in view of the evidence on that point it is not necessary to take judicial notice of that fact in this case.

On the other hand, the defendants claim that the present service is necessary; that during the winter months and bad weather generally the bus service is not always dependable; and that the railroads serve other communities than those served by the bus lines. The principal question seems to be: Does the public interest demand the continuance of these trains? Another question raised is whether the court can pass on the issue of loss on the branch lines without taking into account the loss or gain over the entire system. Certain cases cited appear to hold that other questions are equally necessary as determining factors, such for instance as nonuse by the public thereby occasioning unnecessary expense and loss to the entire system. But defendants claim they are not being operated at a loss considering the revenues and expense over the road as a whole and not the loss in operating a particular train. Defendants contend that before plaintiff is entitled to injunctive relief it must show that its entire operations are unprofitable, and cite Brooks-Scanlon Co. v. Railroad Comm., 251 U.S. 396, 40 S.Ct. 183, 64 L. Ed. 323, also cited by plaintiff. As we read this case it seems to favor plaintiff. Both sides also cite Mississippi R. R. Comm. v. Mobile & Ohio R. R. Co., 244 U.S. 388, 37 S.Ct. 602, 603, 61 L.Ed. 1216, wherein, among other things, it appeared that: "The company is not overcapitalized, that has been wisely and economically managed, and that, nevertheless, its net earnings above the cost of operation, fixed charges, and taxes, and before making any allowance for betterments or for dividends, were only $85,-000 for the year ending June 30, 1914." None of the trains paid the cost of operation; they had tried them before without any order from commission. Auditor testified as to per train mile. In order to avoid insolvency had reduced expenses, etc., over whole system. Officers had reduced salaries 20 per cent. Great falling off in earnings. Sixty-one business men in the towns affected agree trains should be taken off. Evidence on which commission acted was meager. Cost of operating these trains not accepted as proper basis. Was the order arbitrary and unreasonable. The court so held in this case.

This is a brief summary of the facts before the court in that case. That was a strong case for the railroad, but in that same opinion the court said that the state could require the carriers to provide reasonable and adequate facilities to serve not only the local necessities but the local convenience, and may even require the running of another train in a proper case, but that the property invested in the railways of the country is nevertheless under the protection of the fundamental guaranties of the Constitution, entitled to full protection of the law and cannot be taken without just compensation or without due process of law. In our case has the commission gone beyond the rule laid down of providing reasonable and adequate facilities to serve local necessities when there may be no local necessities to serve and the property of the road is subjected to a great expense with very little return. The facts in the above case are not as close to the instant case as in some of the other authorities cited, but the principles of law are there. Several grounds were alleged for

the injunction prayed for in that case, but only one was considered, and that related to the depression and loss of business occasioned by the European War. The commission there was trying to restore the operation of six trains whereby a large loss would be incurred by the railroad; that without these trains there remained reasonably adequate service taking into account the population of the territory involved. Irrespective of the extent to which the European War may still affect business conditions unfavorably in this country, the immediate detriment to the railroad business is the influx of trucks and busses, and other conveyances under motor power that have nearly monopolized the highways of the country, with the foregoing result.

In the Brooks-Scanlon Case, 251 U.S. 396, 399, 40 S.Ct. 183, 184, 64 L.Ed. 323, the court said: "A carrier cannot be compelled to carry on even a branch of business at a loss, much less the whole business of carriage. On this point it is enough to refer to Northern Pacific Ry. Co. v. North Dakota, 236 U.S. 585, 595, 599, 600, 604, 35 S.Ct. 429, 59 L.Ed. 735, L.R.A.1917F, 1148, Ann.Cas.1916A, 1, and Norfolk & Western R. Co. v. [Conley] West Virginia, 236 U.S. 605, 609, 614, 35 S.Ct. 437, 59 L.Ed. 745. It is true that if a railroad continues to exercise the power conferred upon it by a charter from a State, the State may require it to fulfill an obligation imposed by the charter even though fulfilment in that particular may cause a loss. Missouri Pacific Ry. Co. v. Kansas, 216 U.S. 262, 276, 278, 30 S.Ct. 330, 54 L.Ed. 472. But that special rule is far from throwing any doubt upon a general principle too well established to need further argument here. The plaintiff may be making money from its sawmill and lumber business but it no more can be compelled to spend that than it can be compelled to spend any other money to maintain a railroad for the benefit of others who do not care to pay for it. If the plaintiff be taken to have granted to the public an interest in the use of the railroad it may withdraw its grant by discontinuing the use when that use can be kept up only at a loss. Munn v. Illinois, 94 U.S. 113, 126, 24 L.Ed. 77. The principle is illustrated by the many cases in which the constitutionality of a rate is shown to depend upon whether it yields to the parties concerned a fair return."

The underlying principles involved here are illustrated in the following language of the Circuit Court of Appeals in Crawford v. Duluth St. Ry. Co., 60 F.(2d) 212, 215, 216, although the facts relate to a street railway operating under a franchise:

"The provision of the ordinance applicable to the branch lines provides that 'such new lines after being constructed and placed in operation shall be maintained and operated by said railroad company.' The provisions of this ordinance do not operate to create a contract which requires the company to operate when operation means confiscation. In the absence in the ordinance of an express prohibition against abandonment, it was stated in State of Texas v. Eastern Texas R. Co. (D.C.) 283 F. 584, 593: 'The law reads into the contract a proviso, which says: "The railroad may terminate this contract, and withdraw its property from public use; unless compensated, or there is a reasonable future prospect thereof." ' The right to abandon a railway system when the operation results in a loss and amounts to confiscation has been repeatedly upheld. Railroad Comm. of Texas v. Eastern Texas Railroad Co., supra [264 U.S. 79, 44 S.Ct. 247, 68 L. Ed. 569]; Bullock v. Florida ex rel. Railroad Comm. of Florida, 254 U.S. 513, 520, 41 S.Ct. 193, 65 L.Ed. 380; Brooks-Scanlon Co. v. Railroad Comm., 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323. And the same principle has been applied to a branch of a system when the entire system is being operated at a loss, Brooks-Scanlon Co. v. Railroad Comm., supra.

"Conceding the force of the above decisions and admitting the right of the receiver to abandon the entire system, appellants invoke the Wisconsin statute which forbids the abandonment of any part of a street railway without the consent of the city. * * *

"Was the action of the city council of Superior in withholding consent to the abandonment of the branch lines arbitrary and unreasonable? And does the enforcement of the Wisconsin statute amount to confiscation of the property in the hands of the receiver? The regulatory power conferred on the city council by the statute is subject to the limitation that the order must not be unreasonable. The showing of the receiver is that the entire system has been operated at a loss for more than ten years. The loss has increased year by year, caused by a steady decrease in revenue passengers and in passenger revenue. This is accounted for by the large and

steadily increasing use of private automobiles. In the opinion of experts in street railway operation a reduction of service would not· remove the loss. Various increases in fare rate over a number of years have not increased but have lessened passenger revenue. The loss was traced to the· three branch lines. By discontinuing that service it is possible to operate the remainder. If the branches are not abandoned the whole system is lost.

"We think that the case does not fall within the rule of Fort Smith Light & T. Co. v. Bourland, supra [267 U.S. 330, 45 S. Ct. 249, 69 L.Ed. 631]; and that upon the facts averred and proved the action of the city council, particularly in view of the requirement that adequate bus service shall be maintained, must be held to be unreasonable, and the enforcement of the regulatory statute in the circumstances found to amount to a deprivation of rights protected by the Constitution. As stated in State of Iowa v. Old Colony Trust Co. (C.C.A.) 215 F. 307, 313, L.R.A.1915A, 549, 'They cannot force a railroad company to do the impossible.' "

Again the questions before us find illustration in Delaware, L. & W. R. Co. v. Van Santwood (D.C.) 216 F. 252, 255 [also same parties in (D.C.) 232 F. 978], in which the court held: "If numerous nonpaying trains may be compelled in order to serve the convenience of a very few residing in small towns situated between two larger places on the line of the road, it may be done at all points on the line, and the profits, if any, of the paying trains, including freight, will be eaten up; and, if there is to be a curtailment of service, where shall it be, and on what principal based? What is reasonable and what is reasonably necessary is not to be determined by the occasional wants and wishes and convenience of a very few people living at points along the line. It seems to me that when steam trains enough are run between the city of Oswego and the city of Syracuse to accommodate and serve the necessities of the people of those cities and the intervening city of Fulton, and two steam trains per day each way are run which reasonably serve the convenience and supply the reasonable necessities of the four small intervening points, and these people also have the convenience of the trolley line as described, the complainant has performed its whole duty to the public, and that to compel the running of the two

additional trains between these points at a net loss of over $3,000 per annum is unjust and unreasonable and in violation of the constitutional rights of the complainant."

According to plaintiff a summarization of its contentions is found in State of Iowa v. Old Colony Trust Co., 215 F. 307, 312, 313, L.R.A.1915A, 549, from the Circuit Court of Appeals of the Eighth Circuit, in the following words:

"A railroad corporation is in an important sense a public corporation. It is dependent upon the public for its franchises to exist and carry on business, and in consideration of these franchises it assumes and must perform certain duties and obligations for the benefit of the public. Among them, as a general rule, is the duty of maintaining its entire line of road in a reasonably safe and operative condition and for a fair consideration to carry passengers and freight over it at all reasonable times whenever requested to do so. These propositions are elemental and lay down a general rule which cannot be gainsaid or denied. But there are some conditions which necessarily excuse full compliance with the requirements of these rules and, in our opinion, the present case affords a striking example of such conditions. Here is a case where the line sought to be abandoned is not only not self-supporting, but its continued operation jeopardizes the successful operation of the entire system of which it is merely a part. Moreover, its continued operation in its present condition is dangerous to life and property and there is no money or financial ability to improve its condition. Not only so, but there is little public necessity for its continued operation, whereas, there is a great public necessity for the continued operation of the balance of the system.

"In such circumstances the railroad company may abandon such an unprofitable and irreclaimable part of its road and ·neither the state nor unfortunate investors along the line can justly complain. They cannot force a railroad company to do the impossible."

From the showing made by plaintiff it appears that for several years the passenger service over the whole system has been operated at a loss on account of improvement of the highways and the steadily increasing use by the public of motor vehicles, and that this new form of transportation has· taken· away most of the business of the local passenger trains, and that while

these losses may be offset by returns from another class of transportation, it gives the system as a whole only a small margin of gain. But the question we are required to answer is: Does the public interest demand a continuance of the aforesaid trains? No doubt witnesses summoned from the various localities would testify, as they probably did at the hearing before the board, that these services are either indispensable to the public or else not needed. Such testimony would have to be weighed with the proof that the trains are being run at a loss because of nonuse generally by the public. One answer to that question might be found in conditions surrounding the train and bus service between Shelby and Sweet Grass and Great Falls and Lewistown; in the former instance the trains reach places not served by the busses, and if the trains were discontinued there would be no passenger train service between these two points. The same statement would apply to the Lewistown trains, except that there would be a night train in operation, each way, with a change of cars at Moccasin for Lewistown. In view of all the circumstances, would the court be justified in holding that these trains are not needed and that there is no public interest requiring them? Another question in this connection relates to the alleged lack of dependability on the busses in bad weather.

In view of conditions in respect to Lewistown and Sweet Grass, should not the court have further evidence relating to the towns not served by the busses but served by the trains? The testimony of persons familiar with the respective localities and local conditions may have an important bearing on the issues presented. In the present state of doubt on this phase of the case the court does not feel justified in granting the application for injunction requiring a discontinuance of the Sweet Grass and Lewistown trains.

But conditions are different in respect to passenger service each way between Great Falls and Butte. Here the showing seems to be strongly in favor of a discontinuance of the two trains in question, Nos. 237 and 238. It does not appear that public necessity or convenience requires the continuance of this service, and that, under the showing made, to order otherwise would be unreasonable.

Therefore, in the opinion of the court, the application for interlocutory injunction should be granted as to passenger trains numbered 237 and 238 between Great Falls and Butte, and denied as to passenger trains numbered 239 and 240 between Great Falls and Lewistown and passenger trains numbered 41 and 42 between Shelby and Sweet Grass, and it is so ordered.

It is further ordered that the opinion herein be, and the same is hereby, made a part of the record and is hereby adopted as findings of fact and conclusions of law under Equity Rule 70½, 28 U.S.C.A. following section 723, on the application of plaintiff for interlocutory injunction, and the parties and each of them are hereby allowed exceptions thereto.

There appears to have been no stenographic record of the hearing, and according to the recollection of the court there was no stipulation or agreement that the cause was then heard as on final hearing, and therefore the case will remain open subject to application by either side for final hearing, when the cause may be referred to a special master.