CONVERSE et al. v. COMMONWEALTH OF MASSACHUSETTS.

No. 194.

Circuit Court of Appeals, Second Circuit.

Jan. 16, 1939.

SWAN, Circuit Judge, dissenting.

Edward O. Proctor, of Boston Mass., for appellant.

Fred N. Oliver and Willard P. Scott, both of New York City, for appellees Converse and others.

E. R. Brumley, of New York City, for trustees of the railroads.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from an order in bankruptcy in the joint reörganization under § 77, Bankr.Act, 11 U.S.C.A. § 205, of the Old Colony Railroad and the New York, New Haven & Hartford Railroad, which directed the trustees of these two roads to discontinue stops of passenger trains at some 88 stations in Massachusetts and five in Rhode Island; the greater part of these being stations upon the Old Colony. On December 28, 1937, the trustees of the New Haven applied to the Department of Public Utilities of Massachusetts for leave to abandon the 88 passenger stations in question; the Department entertained the petition and held 21 hearings upon it, beginning on February 23d and ending June 16th: these had not been completed, and might not be for a considerable time thereafter. The proceeding before us was begun on June 20, 1938, by the petition of a committee of the officers of savings banks which were holders of bonds of the New Haven. The trustees answered this petition and joined in its prayer; the judge directed that notice should be given to all persons interested; and the Commonwealth of Massachusetts appeared, denied the jurisdiction of the judge, and asserted that the only tribunal competent to pass upon the question was its Department of Public Utilities. The judge overruled the objection, took evidence, made findings of fact and conclusions of law, and entered the order appealed from on July 9, 1938. His findings were in substance as follows. Between October 24, 1935 and December 31, 1937, the Old Colony had a total operating deficit of $5,775,650; for the calendar year 1937 this had been $2,360,000—made up of a freight service credit of $275,000 and a passenger service deficit of $2,636,000—and for the first six months of 1938 it was proportionally even greater. Between 1925 and 1935 Massachusetts had greatly increased its expenditures for highways, paralleling every line of the Old Colony; the automobile registration had more than tripled; and the number of passengers carried by rail in and out of Boston had decreased from 29,000,000 to 14,000,000. By eliminating 93 passenger stations—53 on the Old Colony in Massachusetts, five on the Old Colony in Rhode Island, ten on the Boston and Providence and 25 on the New England—and by an appropriate revision of the remaining passenger schedules, the deficit of the Old Colony could be reduced by nearly $660,000. The suggested operating changes on the Old Colony were impossible without including those on the

Boston & Providence and the New England, but that might properly be done because those two roads were also failing to earn their operating expenses, and their deficits would be reduced. The conclusions of law may also be summarized as follows. The reörganization of the Old Colony could not go through without the proposed changes, because no plan could be confirmed unless the probable earnings of the road would adequately cover its fixed charges. The continuation of the passenger service would imperil the power of the Old Colony to keep up the freight service. The passenger service which was to be ended was not indispensible to the community served, though its discontinuance would cause some inconvenience. The public interest would in the long run be best served by securing the freight service, together with so much of the passenger service as experience had shown to be necessary. The failure to grant the relief asked would result in confiscation.

■ The Commonwealth does not question the facts found by the judge, and the petitioners and trustees do not dispute that the order must rest upon some power conferred upon a reörganization court. They recognize that the charter of the road is conditioned upon its serving the public; and that the measure of that service rests with the grantor—subject to constitutional limitations—through its Department of Public Utilities. They agree that ordinarily the Department alone would have power to say what service should be abandoned, and that the Interstate Commerce Commission has no such jurisdiction over a line or branch not wholly abandoned. (The Commission has itself several times so decided, on the theory that regulating the service upon a line or branch, is different from abandoning it, and that while Congress might perhaps have conferred upon it the larger power, it has not done so). The trustees rest their case first upon the argument that by § 77 of the Bankruptcy Act Congress intended to provide for the reörganization of an interstate railroad as a whole, and that in subdivision (f), 11 U.S.C.A. § 205(f), it specifically provided that a plan duly approved should prevail over all state laws and the orders of any state authority. Having so overridden all local authority, it would be absurd to suppose that Congress should be willing to allow all possible plans to be blocked in advance: that

which is immune from local interference when it comes into existence, must surely be free to be born. We could feel some force in this argument, if the judge had found that it would defeat any plan which could be devised to let the deficit accumulate during the period while the Department might be considering the case, and while its order, if unfavorable, was being reviewed. But he did not so find: all he said was that no plan could go through which did not cut off the service in question; and that is quite different from saying that an added indebtedness at the rate of $660,000 a year, for what could scarcely be more than a year, would balk all possible plans. That is most unlikely, and if the trustees meant to assert it, they should have proved it. Nothing in the testimony of the expert, Cunningham, went so far; nor did the finding that "the emergency now existing on these lines will not permit of the delay and uncertainty inherent in such a programme."

■ The trustees next argue that there is really no question for the Department to determine, because the public convenience from continuing the service cannot possibly balance the losses entailed by it. An order which denied leave to abandon would be confiscatory and could not stand. If so, the stake is no more than the losses suffered while the properly constituted authority is considering the cause: these are no doubt serious, but they are inevitable in all inquiries, and certainly do not justify ousting the tribunal, even in favor of a more expeditious one. Possibly, if it refused to act at all, either expressly, or by such delays as showed that it was not proceeding in good faith, the judge might take over the matter himself. Conceivably such a tribunal may abdicate, and its abdication may be taken as an abandonment by the state of the enforcement of the charter conditions. Crawford v. Duluth St. Ry., 7 Cir., 60 F.2d 212, can be so explained, for the plaintiffs had pleaded that the city council would not entertain their petition to it; though it must be owned that the court did not put the result on that ground. However that may be, on July 9, 1938, there was as yet no warrant for saying that the Department had so delayed the proceeding before it as to show that it meant to evade any decision. Respect for it, and for the Commonwealth, required that it should be allowed to proceed as in other cases: only a power in

substance the equivalent of the power to issue a writ of prohibition could justify prejudging the merits, however plain they may be.

■■ Since there is therefore nothing in the particular situation to justify the order, it can stand only in case the judge in a railway reörganization is in general exempt from state statutes and the orders of state officers which would otherwise regulate and control the action of the corporate officers and shareholders. This the trustees assert, depending upon subdivision (c) (2) of § 77, 11 U.S.C.A. § 205 (c) (2), which provides that the "trustees * * * shall exercise * * * subject to the control of the judge and the jurisdiction of the Commission * * * the power to operate the business of the debtor". This language must be read along with subdivision (c) (6), 11 U.S.C.A. § 205(c) (6), and subdivision (o), 11 U.S.C.A. § 205(o), of which we need discuss only the second, which says that the "trustees * * * shall determine what lines or portions of lines of railroad * * * if any, shall be abandoned or sold during the pendency of the proceedings in the interest of the debtor's estate and of ultimate reorganization but without unduly or adversely affecting the public interest * * * and upon order of the judge * * * authorizing any such abandonment or sale, but only with the approval and authorization of the Commission * * * the * * * trustees shall * * * carry out * * * such abandonment or sale." The argument, as we understand it, is that since the judge with the Commission's approval may abandon any "lines or portions of lines" over which the Commission has jurisdiction, he may abandon any service without its approval over which it has no jurisdiction: the condition need be fulfilled only where the condition is imposed. We see no justification for so trenching upon the usual powers of a state while the reörganization remains in substance a receivership, as it does before the plan is confirmed. Of course the judge supersedes the corporate officers and the shareholders, and may, through his trustees, exercise all their powers. Again, as to any matters over which Congress has extended its arm through the Interstate Commerce Commission, he may with its approval do whatever the road and the Commission together might do without consulting the state authorities; the mere pendency of the reörganization does not affect preëxisting powers. But we cannot see why, merely because the road may in the end be reörganized, the judge should be able to dispense with those conditions which the state has imposed upon the grant that alone makes lawful any operation of the road whatever. So to construe the language of subdivisions (c) and (o) is to make him the tribunal to weigh and decide between the conflicting interests of the owners and the public. The notion behind the regulation of public utilities by specially qualified officials is that a judge is not qualified for such duties—at least in the first instance, or until the facts have been sifted and arranged. Assuming that a bankruptcy act might constitutionally go that far, only inescapable language could justify our imputing to Congress the intent to confer so extreme and unnecessarily provocative a power. The powers of trustees in reörganization are, to some degree at any rate, measured by those of receivers in equity (subd. (c) (2), 11 U.S.C.A. § 205(c) (2), and it has long been the settled policy of Congress to subject receivers in their management of the properties in their custody to the laws of the states, § 124 Title 28, U.S.Code, 28 U.S.C.A. § 124. In Iowa v. Old Colony Trust Co., 8 Cir., 215 F. 307, L.R.A.1915A, 549, the court did indeed affirm an order which allowed the road to abandon part of its lines, over the protest of the state and its railroad commission. The statutes of Iowa provided a proceeding in a state court for that purpose and the railroad substituted for this an ancillary petition in a foreclosure suit. We assume that the court allowed the road to do this under the doctrine that, when once a court has taken custody of a res, it will draw to itself all litigation touching it. That doctrine may properly be made to cover all litigation cognizable by state courts, even though it concern the fulfillment of charter conditions. It is of the essence of the jurisdiction for diverse citizenship that federal courts shall be deemed the equivalent of state. But when the state has set up a specialized tribunal, not judicial, at all, the federal court is not a substitute for it, and may not displace it.

Order reversed: petition dismissed.

SWAN, Circuit Judge (dissenting).

With much diffidence I disagree with my associates. The question is merely one of statutory interpretation, for it is conceded that under its power to enact bankruptcy laws Congress may, if it chooses, exclude state authorities from control over the operation of an interstate railroad which is in process of reorganization. In my opinion section 77, 11 U.S.C.A. § 205, indicates the intention of Congress so to do.

Section 77(a), 11 U.S.C.A. § 205(a), provides that after the petition of the railroad company is approved "the court in which such order approving the petition is entered shall, during the pendency of the proceedings under this section and for the purposes thereof, have exclusive jurisdiction of the debtor and its property wherever located." Section 77(c) (2), 11 U.S.C.A. § 205(c) (2), gives the debtor's trustee all of the powers of a trustee in bankruptcy and, subject to the control of the judge and the jurisdiction of the Interstate Commerce Commission, "the power to operate the business of the debtor." There are other provisions that also make reference to the Interstate Commerce Commission but none which requires approval to be obtained from any state authority. In this respect section 77, 11 U.S.C.A. § 205, differs significantly from section 77B, 11 U.S.C.A. § 207. The latter expressly provides that if the corporation in reorganization is a utility subject to the jurisdiction of a state regulatory body, the plan of reorganization shall not be confirmed until such state authority has been afforded an opportunity to suggest amendments or objections, subdivision (e) (2), 11 U.S.C.A. § 207(e) (2); nor shall securities be issued without obtaining the consent of state authorities having jurisdiction over such matters, subdivision (f) (7), 11 U.S.C.A. § 207(f) (7). In striking contrast to these provisions, section 77 (f), 11 U.S.C.A. § 205(f), provides that upon confirmation of the plan it shall be carried out subject to the supervision of the judge, "the laws of any State or the decision of any State authority to the contrary notwithstanding." Subsection (o), 11 U.S.C.A. § 205(o), also provides that during the pendency of the proceedings the trustee may present to the judge petitions for authority to sell property of the debtor or to abandon lines or portions of lines of railroads, and the judge may grant authority so to do, but only with the approval of the Interstate Commerce Commission when that is required. To my mind these provisions indicate not only that the putting into effect of a confirmed plan of reorganization is not to be hampered by state regulatory authorities but also that the conduct of the debtor's business prior to confirmation is to be under the exclusive jurisdiction of the district judge, except where resort to the Interstate Commerce Commission is expressly required. One of the chief reasons for enactment of the statute was to provide a more expeditious method of reorganization than was afforded by the old receivership procedure. Continental Illinois Nat. Bank & Trust Co. v. Chicago Rock Island & P. Ry. Co., 294 U.S. 648, 685, 55 S.Ct. 595, 79 L.Ed. 1110. If resort to state regulatory bodies were necessary, undesirable delay might well result, as it has in this very case. Nor do I see why control by a state authority should continue up to the date of confirmation, if the confirmed plan may disregard prior orders of the state commission. The district judge has found that no plan could be confirmed unless the proposed reduction of service were made, and that the failure to grant the relief asked would result in confiscation. These findings are not challenged. Hence, enforcement of an order by the state commission refusing the proposed reduction of service could be enjoined. Mississippi Railroad Comm. v. Mobile, & Ohio R. R. Co., 244 U.S. 388, 37 S.Ct. 602, 61 L.Ed. 1216. Under such circumstances, at least, it would seem reasonable to hold that the court of bankruptcy has jurisdiction to protect the res within its custody by curtailing a confiscatory service. In my opinion the order should be affirmed.

The opinion in Re Fonda, J. & G. R. Co., 2 Cir., 95 F.2d 397, at page 399, contains a discussion of section 77(o), 11 U.S.C.A. § 205(o), and interprets that section as requiring the trustee to obtain approval of state authorities as well as the Interstate Commerce Commission when a line is abandoned. As I was the writer of that opinion, it is appropriate to explain that in that case all parties assumed that resort should be had to the state commission. No such issue was presented and the remarks were obiter. After the benefit of argument and more mature reflection, I now think them incorrect.