In re FONDA, J. & G. R. CO.

LISMAN et al. v. FONDA, J. & G. R. CO. et al.

No. 227.

Circuit Court of Appeals, Second Circuit. March 14, 1938.

Miller, Owen, Otis & Bailly, of New York City (Edward C. Bailly and Walter H. Brown, Jr., both of New York City, of counsel), for appellants.

William W. Jenkins, of Schenectady, N. Y., for appellee General Electric Co.

James H. Wood, of Gloversville, N. Y., for appellee City of Gloversville.

Henry W. Thorne, of Johnstown, N. Y., pro se and for certain bondholders.

Before SWAN, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

The Fonda, Johnstown & Gloversville Railroad Company filed a petition for reorganization under section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205 note, in April, 1933. Its transportation properties consist of a steam division, an electric division, and a bus division. During the ten-year period beginning January 1, 1928, the steam division has shown an operating profit, while the electric division has shown losses in each year of that period. In April, 1936, the debtor's trustee desired permission from the District Court to apply to the Public Service Commission of the State of New York and to the Interstate Commerce Commission for leave to abandon the electric lines and substitute motorbus service. The court advised that the request should be presented by the committee which represents 52 per cent. of the debtor's consolidated mortgage bonds of which $5,700,000 in principal amount are outstanding. Such a petition was filed and, after hearings, was

denied by an order entered October 13, 1937. From that order the committee took two appeals; one as of right, the other by leave of this court. They were consolidated and have been heard together.

The first matter for consideration is whether an appeal from such an order can be taken only under section 24b of the Bankruptcy Act, as amended, 11 U.S.C.A. § 47(b), as the appellees contend. If so, our review is limited to matters of law, and the appeal taken as of right must be dismissed. Cf. Guaranty Trust Co. v. Henwood, 8 Cir., 86 F.2d 347, 108 A.L.R. 1020, certiorari denied 300 U.S. 661, 57 S.Ct. 492, 81 L.Ed. 870. Subsection (o) of section 77, as amended, 11 U.S.C.A. § 205 (o) relates to orders authorizing the abandonment of lines or portions of lines of a debtor railroad. It contains this significant sentence: "Any such order of the judge shall be a final order for the purposes of appeal." Were it not for this sentence, we should entertain little doubt that an order granting or refusing leave to abandon, upon obtaining approval of the appropriate regulatory authorities, involved a "proceeding" rather than a "controversy" in bankruptcy, and that an appeal would lie only under clause b of section 24. Since section 24 is made applicable to appeals in proceedings under section 77 by virtue of subsection (l) thereof, 11 U.S.C.A. § 205(l), it was quite unnecessary to insert in subsection (o) the declaration that the order should be "a final order for the purposes of appeal," unless that phrase was intended to add something to the rights an appellant would otherwise have. We can see no significance for it unless it means to make the order appealable as a matter of right. The question is apparently one of first impression; no authority has been cited by counsel, and we have found none. It is true that an absolutely literal reading of "any such order" might confine the meaning to an order granting abandonment and, so construed, would exclude an order refusing it. But it is seldom, if ever, that the right of appeal is made to depend upon whether an issue presented for decision is determined affirmatively or negatively. We cannot think Congress intended to cut so fine. We construe subsection (o) as granting an appeal as of right whether the abandonment prayed for be granted or refused. Hence the motion to dismiss the appeal taken as of right must be denied.

The electric lines sought to be abandoned comprise a line between Gloversville and Schenectady, which carries only passengers, and a line between Gloversville and Fonda, which carries only baggage and express. The line to Schenectady is 33.01 miles in length; the line to Fonda passes over the main line to Johnstown and is a separate line from Johnstown to Fonda, a distance of only 2 or 3 miles. The District Court treated the Fonda line as inconsequential for present purposes, and we shall do likewise. The Schenectady line is a double-tracked, high-speed interurban electric railway, operated on its own private right of way except within cities, and equipped with the best type of modern cars purchased in 1932. The proposal to abandon it was favored by the consolidated bondholders' committee, by the debtor's trustee, and by the Buffalo Savings Bank, a creditor. It was opposed by the cities of Gloversville and Johnstown, by Henry W. Thorne, who represents $14,000 in principal amount of the debtor's consolidated mortgage bonds, and by General Electric Company, a creditor. After brief hearings in May and June, 1936, the matter was adjourned to enable the debtor to make further efforts to reduce operating costs and taxes. Hearings were resumed in April, 1937, and concluded on July 1st. Thereafter the District Judge handed down an opinion in which, besides deciding against abandonment, he expressed the view that operation of the electric lines should be taken from the debtor's trustee, Mr. Hees, and placed in the exclusive charge of a cotrustee to be selected by the court, although no such issues were raised by the pleadings. The order of October 13th contained provisions carrying out Judge Cooper's views in these respects, as well as a provision denying the petition for abandonment. In both aspects it is challenged by the appellants.

It is not clear from the opinion to what extent the decision was influenced by any supposed public interest of the communities served by the interurban line to have such service continued. It apparently played some part, for the only answers to the petition were filed by the cities of Johnstown and Gloversville, and the latter took the laboring oar in opposition at the hearings. Subsection (o) provides that, even if abandonment be sanctioned by the judge, the trustee must obtain the approval of the Interstate Commerce Commission, when required by law, and, also, of the appropriate state regulatory authorities—the lat-

ter requirement being embraced within the clause directing the trustee to "take all steps and carry out all proceedings necessary for the consummation of any such abandonment." In our view, adequate protection of the public interest is provided by these requirements, and the District Judge need only consider the financial advantages or disadvantages to the debtor corporation's estate in the event that permission to abandon shall be granted by the appropriate regulatory bodies. To have the issue of what the public interest requires determined first by the court and again by the proper administrative commission is a procedure wasteful of time and expense, and one for which there is no necessity. We do not construe the statute as contemplating it. Hence, if it appears to the court that a line proposed for abandonment has shown operating losses over a considerable period of time and there is no reasonable prospect of checking them, the trustee should be granted leave to apply to the proper regulatory body for determination of the question of public interest. Such, we understand, has been the procedure generally adopted by the District Courts in reorganization proceedings under section 77 in cases which have not been officially reported.

 In the present record the outstanding fact is that the electric division of the debtor has sustained an operating loss, without including any item for interest on the mortgage bonds, in every year since 1927. The total of such losses is over $490,-000. During the pendency of the reorganization proceedings, the losses for the four years beginning March 1, 1933, aggregated $223,000, plus $60,000 paid on installments, falling due within this period, of the purchase price of equipment. Mr. Hees, the trustee, testified that every possible effort had been made to reduce operating costs and that large reductions in taxes had been obtained within the last two or three years. Even so, the loss for 1936 was $45,-000, and the loss for the year ending May 31, 1937, was $38,500, to which must be added $12,000 more, representing installment payments on equipment and expenses of track changes in Amsterdam. For the calendar year 1937 the estimated loss, based on operations during the first four months, was put at $29,000, exclusive of installment payments on equipment. During the earlier years, part of the losses sustained was attributable to the operation of local trolley lines in Amsterdam. These were abandoned early in 1936; hence, the later figures reflect losses due solely to the two lines now sought to be abandoned. Of course, the figures are arrived at by allocating certain revenues and expenses between the steam, electric, and bus divisions. The basis of such allocation was explained and testimony was presented to prove it fair and proper. No evidence was offered to the contrary. We can find no basis in the record for the statement in the opinion that "the expense of the electric operation indicates inefficiency or unfair allocation of the expenses."

Mr. Hees, who has been employed by the debtor for more than forty years and has served as its president since 1897, expressed the opinion that the electric division could not be made self-supporting. No witness expressed an opinion to the contrary. However, Mr. Beeler, an engineering expert upon whose advice a one-cent per mile rate of fare had been tried by the trustee for five and one-half months in 1935, testified that if the one-cent fare had continued to expand patronage at the rate it was increasing when the experiment was terminated, then "operating results should have been much better than at present." He said, "I think it was rather possible that they would have increased to a point where it could have broken even or even made a profit at that rate of fare." While the one-cent fare experiment had increased patronage, it had not increased income. It was discontinued with the approval of the court, and the two-cent rate then established has produced better financial results. Mr. Beeler's testimony was to the effect that it would take two or three years to give the one-cent rate an adequate trial. His opinion that it might possibly then succeed was based on the experience of two electric railways which had operated under conditions so dissimilar to those of the debtor as to make their experience of little significance. We think his testimony too vague and indefinite to justify continuance of a line which had shown large deficits for so many years. Moreover, Beeler himself testified that the substitution of busses would result in a more economical operation.

Furthermore, large capital expenditures will be needed if the electric division is to continue in operation. Installments of purchase price on trolley cars and electrical

equipment that will have to be paid amount to more than $100,000. In addition, the state authorities have expressed the view that the Scotia Railroad bridge over the Mohawk river, by means of which the cars enter Schenectady, will have to be extensively repaired. The estimated cost of doing that work is in the neighborhood of $200 000. It is true that the state authorities have been indulgent. The bridge was declared unsafe in 1916; nevertheless the use of it has been continued. It does not definitely appear that the debtor will be ordered to reconstruct the bridge immediately. The District Court thought that in the future some arrangement might possibly be worked out whereby the state and interested municipalities would share in the cost of reconstructing the old bridge, or that the debtor might lay tracks one-quarter mile to another bridge over the Mohawk; but the financial condition of the debtor would scarcely seem to warrant optimistic reliance upon the continued indulgence on the part of the state engineers. In view of the sizeable and continuous deficits on the electrict division for past years, the burden of these capital expenses, both actual and potential, looms large, and furnishes an additional reason for thinking it financially expedient to abandon the electrical division.

There was testimony that the capital expenditures necessary for the substitution of bus service could be more than met by the salvage value of property of the electric division, if abandoned. The estimates of two expert engineers were introduced as to the probable revenues and expenses of operating the bus services, and their estimates disclosed a substantial profit. The District Judge thought their estimates too optimistic; but he did not demonstrate, and we find nothing in the record to indicate, that bus service, even if it did not make the expected profit, would not cut substantially the loss to be expected from a continuance of the electric service. On the evidence presented we see no justification for a finding that there is any reasonable prospect that a reduced fare will enable the electric lines to be operated at a profit, or that the substitution of bus service is so much of a "gamble" that the debtor should not be permitted to undertake it. The petition should have been granted.

The provisions in the order having to do with the appointment of Mr. Montgomery as cotrustee to have exclusive control of the property used solely in connection with the electric lines appear to have been made in complete disregard of the statute. No notice was given of the proposed appointment of an additional trustee, as required by section 77(c), subdivisions (1) and (2). The appointment was to be immediately effective without the ratification by the Interstate Commerce Commission, and was to be irrevocable for one year, contrary to the provisions of said subdivisions. The original trustee was removed with respect to administration of the debtor's electric division without a hearing and without "cause shown," as required by subsection (c)(2). In January, 1938, the District Judge took notice of these irregularities, and, after notice to parties interested in the debtor's estate, made a second order purporting to appoint Mr. Montgomery as cotrustee "to take effect as of October 9, 1937." In the meantime, on December 21, 1937, the Interstate Commerce Commission approved his earlier appointment. In view of the statutory provision that "such appointments shall become effective upon ratification thereof by the Commission," we think that this is not a case where a nunc pro tunc order is appropriate or can be effective. Moreover, since the petition for leave to apply to the proper regulatory bodies for abandonment is to be granted, the reasons given for appointment of an additional trustee are no longer applicable.

Upon the question of abandonment we have considered the case upon the appeal taken by the appellants as of right, upon which both facts and law are open for review. It seems expedient to add, however, in the event that our views as to the appealability of the order should prove to be erroneous, that, had we considered only the appeal taken with leave, we should have held denial of the appellant's petition to be an arbitrary exercise of discretion on this record, and reversible as a matter of law. The questions relating to the appointment of a cotrustee we have considered upon the appeal taken under section 24b, these being matters arising in bankruptcy proceedings and not appealable as of right.

The order appealed from is reversed.