## In re DENVER & R. G. W. R. CO.
### No. 8669.

District Court, D. Colorado.
March 26, 1940.

Thomas R. Woodrow and Theodore A. White, both of Denver, Colo., for trustees.

David W. Carmody, of Santa Fe, N. M., for State of New Mexico.

James E. McFeely, Jr., of Pueblo, Colo., for Brotherhood's Rail Service Club.

SYMES, District Judge.

Pursuant to subsection *o*, § 77 of the Bankruptcy Act, as amended, 11 U.S.C.A. § 205, sub. *o*, the Trustees filed a petition, November 14, 1939, for authority to abandon the debtor's Santa Fe branch, a narrow gauge single track line extending from Antonito, Colorado (the end of debtor's broad gauge line), in a southerly direction 125.31 miles to Santa Fe, New Mexico, constructed in 1880–1886. The matter was heard at Pueblo December 18, 1939, considerable testimony taken, arguments made and briefs filed.

Subsection *o*, supra, states the trustees shall from time to time determine what portions of the railroad should be abandoned or sold during the pendency of reorganization proceedings in the interest of the debtor's estate, and of ultimate reor-

ganization without unduly or adversely affecting the public interest, and shall petition the court for authority so to do.

 It then provides that after hearing upon notice to parties in interest the court may authorize such an abandonment, "but only with the approval and authorization of the Commission when required by the Interstate Commerce Act [chapter 1 of title 49 U.S.C.A.]," etc. Clearly we think the hearing contemplated by the statute must meet the test of "due process." That requires notice to interested parties, reception of testimony, examination and cross-examination of witnesses, argument by counsel, a finding that abandonment would not "unduly or adversely affect the public interest," and that the order made, which is final and appealable, be supported by the record. The additional requirement that an abandonment, if authorized, be approved by the Interstate Commerce Commission is outside our question. We respectfully dissent from the view expressed by Judge Swan of the Second Circuit Court of Appeals (In re Fonda, etc., Co., 2 Cir., 95 F.2d 397), that under sub. o, § 77, the court need not pass on the question of the public interest and need only consider the financial advantages or disadvantages of abandonment to the debtor's estate, since adequate protection of the public interest is provided by the requirement that abandonment be sanctioned by the Interstate Commerce Commission. In a later case in the same court, Converse et al. v. Massachusetts, 2 Cir., 101 F.2d 48 (affirmed as Palmer et al. v. Massachusetts, 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. ——), Judge Swan, in a dissenting opinion, refers to the Fonda case and observed that as the writer of that opinion he thinks it incorrect. Our view is a petition for abandonment requires a plenary hearing in the district court, and if the petition is granted, a hearing and approval by the Interstate Commerce Commission.

 This line runs through semi-mountainous country, and according to the petition, was operated during the last five years at a loss of $53,000 a year, and that a survey of prospective business indicates no reasonable probability of a sufficient increase to justify the relatively large expenditures for deferred maintenance and rehabilitation urgently needed if operations are to continue.

The rail in track consists 8.32 miles of 45-pound rail, 6.63 miles of 52-pound, 32.31 miles of 57-pound, 70.49 miles of 65-pound, and 7.73 miles of 70-pound, of which 47 miles is classed as poor and dangerous. The 70-pound rail is in good condition.

Economical and safe operation requires 175,000 new ties over a five-year period, 21 bridges be renewed and 21 filled. Many new culverts, ditching, and bank widening are necessary. Twenty-five miles per hour is the limit of safe speed for the heavier power now used. The total cost of rehabilitating, according to debtor's Maintenance of Way Engineer, Mr. Perlman, is $510,000, of which 30% should be spent the first year and 20% a year thereafter.

The property has been much under-maintained under the Trusteeship and for a few years before, and $100,000 maintenance per year is required even after the capital expenditure indicated.

The only town of any size served is the southern terminus, Santa Fe, New Mexico, population 11,176 (1930). The next largest station has 600 population, the next 314, the next 275, etc. With the exception of Santa Fe there has been no increase in population of the territory served since 1930. One witness testified the population on the line, and territory tributary thereto, was less than 26,000.

At the time the line was built it received considerable tonnage from lumber mills, flour mills, livestock shipments (both sheep and cattle). This has largely disappeared due to aridity and lack of feed. 85% of the livestock range to the west of the line is conveniently served by the debtor's Chama-Durango narrow gauge branch.

Santa Fe is adequately served by a short spur from the main transcontinental line of the Atchison, Topeka and Santa Fe to the south, and for reasons presently stated, offers very little business to this branch. Our line is handicapped by the valid objection of shippers to the necessary transfer of freight from narrow gauge to standard gauge cars and vice versa at Antonito and Santa Fe. This occasions delay, expense, and damage to certain kinds of freight.

The earnings picture is a dismal one. Total earnings from all traffic on the branch was $707,609 for 1934 to 1939, inclusive. Operation costs for the same period, before taxes, were $768,538, taxes $102,812. Breaking these figures down, we find maintenance of way, ordinary, dropped from a high of $78,000 odd in 1936 to $30,000 in 1939, and maintenance of way, road

and equipment, from a high of $46,944 in 1936 to $723 in 1939. In spite of this drastic cut in maintenance the net loss during this period was $262,330, varying from a high of $102,446 in 1936 (the year of unusual high maintenance), to a low of $13,860 in 1939, the latter figure undoubtedly due to lack of maintenance.

A graphic illustration of the situation is Ex. O, showing the number of cars and commodities handled in 1938. In that year 196 cars of freight originated and 560 terminated on the branch, a total of 756, one car each way per day. Nor was each and every one of these cars necessarily hauled the full mileage, and only 43 cars were bridge traffic delivered to the Santa Fe, and only 74 were received from that road. Transportation costs (payroll) increased from $42,055 in 1934 to a high of $48,703 in 1938, in spite of cuts in rates, falling revenues and volume. Witnesses on behalf of the railway brotherhoods testified but offered no relief from this item of cost.

Passenger revenue derived from a mixed train each way each day excluding Sundays, averaged $7,876.23 per year over the five-year period, 1934 to 1938, inclusive. The first nine months of 1939 showed a slight decrease over the corresponding period.

The exhibits that lay bare the dollars and cents picture do not tell the whole story, nor the burden this branch is on the rest of the system. Overhead and many other incidental expenses not capable of pro-rating are not figured in, yet must be considered. Consequently the loss is larger than indicated. Ex. R indicates the traffic density for 1938, .02 northbound and .10 southbound, the lowest on any part of the system.

Truck competition is a most serious factor. All agree loss of business to trucks has increased materially for several years. The testimony is: The State of New Mexico makes no pretense of regulating truck traffic; does not actually require the filing or maintenance of rates or schedules. The business is cutthroat. Not only is the railway paralleled by regular truck lines but the unlicensed contract trucker, operating one or two trucks, takes business at any price he can get. Merchants and other businessmen testified there is no assurance their competitors do not get a lower rate.

Witnesses for New Mexico stated some merchants would be inconvenienced by the abandonment, due in part it would seem to the fact the highways are not all-weather roads, and that better service might bring back some old and attract new business. Those who so testified were interested mostly in gasoline, flour, cement and mica shipments. One witness expressed the view the railroad competition was necessary to keep the trucks in order.

Large Denver jobbers apparently find it to their advantage to serve Santa Fe from Denver by trucks or from branch storehouses maintained in Santa Fe and Albuquerque. Furthermore Santa Fe merchants for geographical and other compelling reasons do more business of various kinds with Texas and western and southeastern points than with Denver.

At the request of the court a study of the prospects of future business for this line was made. Shippers, both present and prospective, were canvassed in detail and all factors considered. The results are negative.

We recognize the Trustees have let this branch slide and have not maintained service. This doubtless accounts for the loss of some business since the reorganization proceedings were initiated. Boiled down the question seems to be: Does the present operation, consisting of one carload of freight and a few passengers each way per day and the doubtful prospect of future increase, justify the expenditure of half a million dollars for deferred maintenance plus a higher annual maintenance. We think not. To get any amount of new business and render good service the line must be made broad gauge and new equipment provided.

The bondholders would object, and rightly so, to any such expenditures. But beyond that it would be a futile gesture; at least until New Mexico regulates truck competition in a manner comparable to other states. Joint truck and railroad service is not justified and the argument of the State of New Mexico that abandonment would "unduly or adversely affect the public interest," would be more convincing if the railroad was given an opportunity to compete with trucks on a fair basis.

The petition is granted.