**In re NEW YORK, S. & W. R. CO.**

**No. 9067.**

Circuit Court of Appeals, Third Circuit.

Argued May 9, 1946.

Decided Dec. 19, 1946.

As Amended on Denial of Rehearing March 7, 1947.

Writ of Certiorari Denied June 9, 1947.
See 67 S.Ct. 1537.

c

John M. Harlan, of New York City (Ralph E. Lum, of Newark, N. J., Root, Ballantine, Harlan, Bushby & Palmer (formerly Root, Clark, Buckner & Ballantine), Roy M. D. Richardson, Lyman M. Tondel, Jr., and Ulrich Schweitzer, all of New York City, on the brief), for appellant.

Jacob Aronson, of New York City (William H. Carey and John A. Hartpence, both of Jersey City, N. J., and Leo Manville and Robert D. Brooks, both of New York City, on the brief), for other appellees.

Hobart, Minard & Cooper, of Newark, N. J. (M. C. Smith, Jr., of Cleveland, Ohio, on the brief), for Erie R. Co.

Before BIGGS, EDGERTON and McLAUGHLIN, Circuit Judges.

BIGGS, Circuit Judge.

The appeal at bar presents the question whether the trustee of New York, Susquehanna and Western Railroad Company, the debtor, appointed pursuant to the provisions of Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, may disaffirm two trackage agreements dated respectively April 6, 1904 and April 1, 1911. The court below held that the attempted disaffirmance by the trustee was invalid. The trustee and certain bondholders, constituting the so-called "Insurance Group", have appealed.

The court below found that The New York Central Railroad Company, by way of one of its subsidiaries, possessed a vested interest under the contracts sought to be disclaimed in certain trackage known as the "Edgewater Section" in and near Edgewater, New Jersey; that the trustee in 1942 expressly had assumed the contracts as an incident of the recovery by him of the Edgewater Section;[1] that the contracts were not executory in whole or in part and were not burdensome; that therefore the contracts might not be disaffirmed. But if The New York Central Railroad Company's subsidiary acquired no vested interest in the Edgewater Section trackage and if the contracts of 1904 and 1911 were executory, the provisions of Section 77, sub. b[2] might permit and certainly would not preclude a rejection of the contracts in a plan of reorganization approved pursuant to the provisions of Section 77, sub. e.

A plan of reorganization was proposed by the debtor and was submitted to the Interstate Commerce Commission pursuant to Section 77, sub. d. This plan was the subject of two reports[3] by the Commission, was approved by it and may now be ready for submission to the court below.

The Insurance Group requested the Commission to insert in the plan the following provision for conditional disaffirmance pursuant to Section 77, sub. b: "However,

---

[1] In respect to what is known as the "Edgewater Section" the court below concluded as follows:

"Conclusion II. The trustee of the Susquehanna Company, under the agreement of January 31, 1942, acquired all of the 'right, title and interest' of the said Terminals Company 'in and under each and all of the contracts, agreements, leases and licenses relating to the Edgewater Section', including the basic agreements of 1904 and 1911, and assumed 'all liability and obligation' of the said Terminals Company thereunder. This assumption of liability was, to all intents and purposes, an unconditional assumption of the said basic agreements, and did not comprehend a reservation, express or implied, of the right to reject or disaffirm these agreements."

The company referred to by the court below as the "Terminals Company" is Erie Terminals Railroad Company, owned by the Erie Railroad Company. See the agreement of January 31, 1942, Exhibit 59. See also Exhibit 63, letter of January 31, 1942 written by H. A. Taylor, Vice-President of Erie Terminals Railroad Company to Walter Kidde, predecessor trustee.

It is unnecessary to burden this opinion with a detailed description of the "Edgewater Section". See the reports of the Commission, 249 I.C.C. 777; 257 I.C.C. 593, 664; 261 I.C.C. 101, 113 and the Findings of Fact of the court below.

[2] "The adoption of an executory contract or unexpired lease by the trustee * * * of a debtor shall not preclude a rejection of such contract * * * in a plan of reorganization approved hereunder * * *."

[3] See 257 I.C.C. 593 and 261 I.C.C. 101.

in the event that it is adjudicated by the highest court to which the question is presented, or it otherwise appears from the decision of such court that the agreement dated April 6, 1904, between the Edgewater and Fort Lee Railroad Company and the New Jersey Shore Railroad Company, or any agreement supplemental thereto, may not be rejected by the trustee of the debtor, but may be rejected in its plan of reorganization, the plan rejects any of said agreements as to which such a decision shall have been reached and the reorganized company shall not be deemed to have assumed them." See 257 I.C.C. at p. 667. The Commission by Division 4 refused this request, stating, "Considering all elements of the public interest, the interests of the particular railroads involved, and the interests of shippers in the immediate vicinity and of the public generally, we are of the opinion and find that the plan with the inclusion therein of the requested disaffirmance provision would not be compatible with the public interest." See 257 I.C.C. at p. 668. Later the question came before the full Commission which affirmed the conclusion of Division 4 and rejected a disaffirmance of the contracts as against the public interest. See 261 I.C.C. pp. 115-117.

The trustee and the Insurance Group expressed their intention of pressing their objections to the Commission's elimination of the provision for conditional disaffirmance of the contracts at the hearing on the plan of reorganization to be held by the District Court.

■ We think it clear that the contracts did not vest such an interest in The New York Central Railroad Company's subsidiary as to prohibit their rejection. The right given was only a trackage right and the contracts did not run with the land or impose any lien upon the property or convey either title or easement. Baker v. Central Trust Co., 6 Cir., 235 F. 17; General Finance Corporation v. New York State Rys., 2 Cir., 54 F.2d 1008. For analogy see Chicago, M., St. P. & P. R. Co. v. Chicago, R. I. & P. Ry., 8 Cir., 138 F.2d 268, certiorari denied 320 U.S. 804, 64 S.Ct. 437, 88 L.Ed. 486. It may be noted that the very location proposed for the trackage in the 1904 agree-

ment was altered drastically by the terms of the 1911 agreement.

That both agreements are executory in part is demonstrated by the provisions for the sharing of the burdens of interest, of maintenance, of taxes and of assessments and for the payment by The New York Central Railroad Company's subsidiary of a reasonable switching charge to get cars across the Edgewater Terminal.

That the provisions of the contracts run for the benefit of the debtor is demonstrated by the provisions of paragraph "Sixth" of the 1911 contract whereby the debtor was in effect made a party to both agreements.

We cannot say that the court below erred in finding that the trustee assumed the 1904 and 1911 contracts when he acquired title to the Edgewater Section. See note 1, supra. There is sufficient evidence in the record to support this finding.

■ The court below found that the 1904 and 1911 contracts were not burdensome. This is a conclusion of law. It is a fact that New York, Susquehanna and Western Railroad Company is compelled by the terms of the 1911 agreement to switch the New York Central Railroad Company's cars across the Edgewater Terminal "for a reasonable switching rate or charge" and without the benefit of a division of the revenue. The Commission in its report, 261 I.C.C. at p. 115, stated in respect to this matter, "We see no reason why the situation cannot be adequately remedied without the disaffirmance of the basic contracts, by the termination of the existing switching agreements and the publication by the Susquehanna of just and reasonable rates which would cover all the movements of the Central's cars here discussed. The point may be raised that the Susquehanna would not be justified in publishing switching rates for movements which appear to be under trackage rights of another carrier. But the situation here is due to the historic reasons for its development, the congested field of operations, the crossing of the terminal, the expense and economic consequences of expanding the present facilities on ground already used for the industries feeding the railroad, which, taken as a

whole, clearly indicate that no change should be made in the general method of physical operations now employed. Moreover, the switching rates would apply over the tracks of the Susquehanna even though the movements be related to preexisting rights therein held by the Central."

As we understand it, what the Commission has proposed for the benefit of the debtor is the substitution of a reasonable switching rate or charge, as required by the 1911 contract, to be imposed on The New York Central Railroad Company in lieu of the present rate provided by switching contracts subsequent to 1911 for the benefit of The New York Central Railroad Company, the present rate being in reality a "cost" rate. The rearrangement of rates can be effected within the framework of the 1904 and 1911 contracts since, as we have pointed out, the 1911 contract speaks of a reasonable switching rate or charge and authorizes only such to be made. We conclude that the 1904 and 1911 contracts may be considered, as the court below considered them, apart from the later switching agreements based upon them and the fact that the Commission, in the exercise of its expert administrative judgment, finds a readjustment of costs between the debtor and The New York Central Railroad Company necessary, demonstrates only that the agreements subsequent to 1911 are burdensome. The debtor's switching of The New York Central Railroad Company's cars at cost and without a division of revenue may be corrected by the Commission in the exercise of the functions granted to it by Congress. We cannot find, therefore, that the court below was in error in finding the 1904 and 1911 contracts not to be burdensome.

We have expressed our views respecting the findings and conclusions of the court below for the sake of clarity but it was not necessary to do this. Other factors and circumstances are decisive in the case at bar. We will proceed to discuss them at once.

▆▆▆ The court below did not have before it for consideration a plan of reorganization to be approved or disapproved by it pursuant to the provisions of Section 77, sub. e. The court, as we apprehend its course, proceeded to a hearing as if under Section 77, sub. o which provides, inter alia, that the trustee during the course of the proceeding, "from time to time, shall determine what lines or portions of lines of railroad" should be abandoned "without unduly or adversely affecting the public interest". We entertain no doubt that trackage rights must be considered to be the equivalent of a line or a portion of a line of railroad whether within the purview of subparagraph o or subparagraph e. Thompson v. Texas Mexican Ry. Co. (Tex-Mex), 328 U.S. 134, 937; Transit Commission v. United States, 289 U.S. 121, 128, 33 S.Ct. 536, 77 L.Ed. 1075; Union Pacific Ry. Co. v. Chicago R. I. & P. Ry. Co., 163 U.S. 564, 16 S.Ct. 1173, 41 L.Ed. 265. But as subparagraph (o) has been construed by the courts a finding by the Commission that abandonment of specified trackage is or is not adverse to the public interest is a prerequisite to action by a District Court. See The Tex-Mex case, supra. We conclude that the determination of the question of whether or not trackage may be abandoned has been lodged by Congress solely in the Commission. The Tex-Mex case; Smith v. Hoboken R. R. Warehouse & S. S. Connecting Co., 328 U.S. 123, 66 S.Ct. 947; In re Fonda, J. & G. R. Co., 2 Cir., 95 F.2d 397; Converse v. Commonwealth of Massachusetts, 2 Cir., 101 F.2d 48, affirmed sub nom. Palmer v. Massachusetts, 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. 93. Cf. In re Denver & R. G. W. R. Co., (D.C.D.C.) 32 F.Supp. 244.

While the court below had before it the reports of the Commission hereinbefore referred to [4] in which views were expressed respecting the 1904 and 1911 contracts and the public interest, the Commission was considering these questions in connection with a specific plan of reorganization which, insofar as the record before us shows, has not as yet been certified to the District Court. Subparagraph o was designed to permit the Commission and the

---

[4] See footnote 3.

court during the course of a Section 77 proceeding to deal with proposals made by a trustee for abandonment "from time to time" of a portion of a line of railroad. Under subparagraph *o* the Commission and the court are not concerned with immediate reorganization but with "ultimate reorganization". The court took judicial notice of the reports of the Commission and there was no certification to it by the Commission of any matter respecting the plan of reorganization including the trackage rights.

It should be noted again, however, that the Commission in its reports respecting the plan, including its refusal to permit disaffirmance of the 1904 and 1911 contracts, none the less indicated that switching rates should be published which would alter the 1904 and 1911 contracts in a vital respect, viz., by no longer requiring The New York Central Railroad Company's cars to be switched at cost by the debtor. It may be argued that the Commission cannot mold the agreements in such an important respect without in substance disaffirming the 1904 and 1911 contracts. But this is not true. As we have stated, the trackage rights may remain available to The New York Central Railroad Company while the rates charged for switching may be altered by the Commission as public interest may require. The function of determining the status of the trackage rights and of switching rates rests solely with Commission under the decisions cited above. But these elements may have a telling impact upon a plan of reorganization, whether it be on that plan which is presently before the Commission or on some other plan which may hereafter be submitted to the Commission and later to the court.

■ Congress has also imposed functions on the court under subparagraph *e,* viz., the approval or disapproval of the plan as fair and equitable and conforming "to the requirements of the law of the land". In short, though the decision of the Commission is paramount in respect to any question concerning trackage rights or rates, the decision of the court is equally necessary for the approval of any plan of reorganization. We conclude in respect to a proceeding under subparagraph *o* that while the decision of the Commission is paramount in respect to any question concerning the trackage rights here in dispute, the decision of the District Court is equally important in regard to any other matter.

■ The question presently before us may therefore be stated as follows. Was the decision of the District Court premature in rejecting the trustee's determination to disaffirm the agreements in advance of any certification by the Commission to the court in a proceeding inaugurated either by the trustee or by The New York Central Railroad Company or by New Jersey Junction Railroad Company under subparagraph *o*? See Section 1(18) of Part I of the Interstate Commerce Act, 49 U.S.C.A. § 1(18), and the Tex-Mex case 328 U.S. at p. 145, 66 S.Ct. 937. If the answer be in the affirmative, it will be necessary for this court to vacate the order of the court below and remand the case to the District Court with the direction to await the certification of the Commission. If the answer is in the negative the order complained of should be affirmed.

It may be argued with some plausibility that in view of the fact that the court below did not err in finding that the trustee assumed the 1904 and 1911 contracts when he acquired title to the Edgewater Section that the court as a court of equity could not permit the trustee to benefit from assumption and thereafter reject the contracts which he had assumed. We conclude, however, that the power and duty of the Commission to determine in the public interest whether trackage rights shall or shall not be terminated is paramount and that no element other than public interest may be considered by the Commission. It follows therefore that if the Commission were to determine that The New York Central Railroad Company's trackage rights should be terminated the District Court could take no other view. If the Commission should decide that The New York Central Railroad Company's trackage rights should be terminated, it is surmised that the court below, as a matter of equity, the Commission agreeing and the

Ohio District Court [5] concurring, might compel modification of the agreement of January 31, 1942. The possibility or propriety of such a course is not before us, however. We conclude that the District Court should not have considered the question of termination of the 1904 and 1911 agreements in a subparagraph o proceeding absent the certification [6] by the Commission of its decision respecting the issue of modification of the switching rate. The trustee therefore should petition the Commission for the certification of its opinion on the question. Absent such a certification the Distrit Court was without power to proceed in the permises. It follows that its order was premature.

In this connection we think it desirable to point out that the Commission stated in its second report [7] that the switching rate should be modified in favor of the debtor, but said also that in the absence of a record upon this issue it could not decide on a rate. While the trustee states that he seeks the disaffirmance or rejection of the agreements, in substance he desires a modification of the switching rate in the debtor's favor. It is possible that there is an area in the administrative field where these matters may be worked out if a proper record were presented to the Commission. It is possible also that the Commission would include the formula for such a switching rate in the plan of reorganization if pertinent data were before it.

We note the provisions of subparagraph b which provide that "The adoption of an executory contract * * * by the trustee * * * shall not preclude a rejection of such contract * * * in a plan of reorganization." But the rejection of trackage rights even under a plan of reorganization must also rest with the Commission and if the trustee or the Insurance Group are to gain relief they must procure it not by way of disaffirmance of contracts to be conditioned on the decision of the highest court before which the matter may come but from the Commission by the exercise by that body of the power conferred on it by Congress.

The order of the court below is vacated and the cause is remanded with the direction to proceed in a manner not inconsistent with this opinion.

---

[5] The District Court of the United States for the Northern District of Ohio, Eastern Division, in charge of the proceedings for the reorganization of Erie Railroad Company, No. 45839 on its docket.

[6] See the provisions of Section 1 (18) of Part I of the Interstate Commerce Act, 49 U.S.C.A. § 1 (18).

