**In re LONG ISLAND R. CO.**
Bk. No. 47970.

United States District Court
E. D. New York.

July 6, 1950.

See, also, 83 F.Supp. 974.

86

Richard R. Bongartz, New York City, Cullen & Dykman, Brooklyn, N. Y. (Jackson A. Dykman, Brooklyn, N. Y., of counsel), for trustees of property of Long Island R. R. Co., debtor.

Geist & Netter, New York City (A. Joseph Geist and George E. Netter, New York City, of counsel), for Chamber of Commerce of the Rockaways.

O'Connor, Painton & O'Connor, Rockaway Beach (James S. Painton, New York City, of counsel), for Committee for Immediate Restoration of Rail Service to the Rockaways.

John J. Knob, Mineola, N. Y. (Francis J. Donovan, Deputy Co. Atty., Mineola, N. Y., of counsel), for Nassau County.

John P. McGrath, Corp. Counsel, New York City (G. Gary Sousa, Asst. Corp. Counsel, New York City, of counsel).

KENNEDY, District Judge.

By petition dated May 31, 1950, the trustees in this proceeding request permission to apply to the Interstate Commerce Commission, pursuant to statute, 49 U.S.C.A. § 1, pars. 18–20, for a certificate that the present and future public convenience and necessity permit the abandonment of that portion of the Rockaway Beach Branch of the Debtor's railroad extending from a point 0.2 mile south of Hamilton Beach to a point midway between Beach 84th Street and Beach 85th Street, Holland, and that portion of the Far Rockaway Branch of the Debtor's railroad extending from the junction of the said branch with the Rocka-

way Beach Branch at Hammel to a point midway between Beach 79th Street and Beach 80th Street, Arverne.

The application is based primarily on the fact that on the night of May 7th and the morning of May 8, 1950 a fire of undetermined origin totally destroyed approximately 1,800 feet of double-track wooden trestle over Jamaica Bay on the Debtor's Rockaway Beach Branch. Since the destruction of the trestle, passenger service has been operated to and from Rockaway Park and intermediate points on the Rockaway peninsula over the Rockaway Beach and Far Rockaway Branches via Valley Stream and Jamaica, which a glance at the map will show is a roundabout route. The proposal of the trustees is to continue this service. It is pertinent to observe that during the past eight years there have been 29 fires on the now burned-out trestle, the replacement costs of which have totaled $622,171. The trestle has been in existence for some 70 years, but the last fire was the worst: there was a wind of gale force and the tide was low, making it impossible for floating fire-fighting equipment to be used.

No revenue freight trains have been operated over the Jamaica Bay trestle during the past ten years.

A number of civic bodies appeared on the return day of the petition and put forward arguments concerning the necessity of a means of transportation directly across Jamaica Bay. Their names are noted in the margin.[1] All of these appearances were treated as petitions to intervene, for this proceeding only, and subject to a reservation on my part concerning my power to deal with questions of public convenience and necessity. At the taking of proof only two of the intervenors participated actively,

the Rockaway Chamber of Commerce, and the Committee for the Immediate Restoration of Rail Service to the Rockaways. But the understanding was that the representatives of these two bodies would act for all of the others in the presentation of such material as was available.

■ Before entering into any discussion of the facts it is manifest that I should consider the scope of my own authority, because, as has often been pointed out, the power of the courts over public utilities is sharply limited by a legislative policy, state and federal, entrusting exclusively to administrative bodies like the Public Service Commission and the Interstate Commerce Commission many matters which might otherwise be the subject of decision in court proceedings.

■ At the outset, the Public Service Commission of the State of New York challenges the jurisdiction of the Interstate Commerce Commission over the subject matter and asserts that the Public Service Commission of the State of New York has exclusive jurisdiction. Generally speaking, Section 77 of the Bankruptcy Act, 11 U.S. C.A. § 205, under which this proceeding was brought, does not authorize a district judge to order discontinuance or curtailment of local service without authorization of the state commission. Palmer v. Massachusetts, 1939, 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. 93. And the Public Service Commission in its brief says something with which I fully agree: "Upon any theory of the case, therefore, a final decision that the trestle is not to be rebuilt could only be made by an appropriate regulatory agency".

■ Now there can be no doubt that the Long Island Rail Road is a carrier subject

1. Rockaway Civic Club, Inc., Commodore Hotel, Rockaway Park, N. Y.; Frank Avenue Civic Association of Edgemere, Long Island, Inc.; Rockaway Board of Trade and Taxpayers Association, Inc.; Bayswater Civic Association, Inc., 1376 Sunnyside St., Bayswater, Far Rockaway, N. Y.; The Wavecrest Civic Ass'n.; Democratic County Committee and the Democratic Lawyers' Association, Nassau County, Intervenors; Beach 116th Street Corporation, 40 Exchange Place, N.Y.C.;

Rockaway Park Business Men's Association, Inc., 257 Beach 116th Street, Rockaway Park, N. Y.; Rockaway Rotary Club, Rockaway Beach, N. Y.; Harry Jeffs, 55 Pierrepont St., Brooklyn, N. Y.; The City of New York appeared, and formal petitions in the nature of cross-motions were filed by the Rockaway Chamber of Commerce and by a committee of individuals (Committee for the Immediate Restoration of Rail Service to the Rockaways).

to the Interstate Commerce Act. Transit Commission v. U. S., 1936, 284 U.S. 360, 52 S.Ct. 157, 76 L.Ed. 342; Transit Commission v. U. S., 1933, 289 U.S. 121, 53 S. Ct. 536, 77 L.Ed. 1075. Nor can there be any doubt that if the present application envisages the abandonment of the line, or "any portion of a line" the relevant statute *(supra)* places the subject within the jurisdiction of the Interstate Commerce Commission on the theory that so long as the railroad is subject to the Interstate Commerce Act it is a federal concern that interstate commerce be not burdened by the unreasonable expense of operating at a loss "any portion of a line" of a railroad. State of Colorado v. U. S., 1926, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878. Beyond doubt the partial absorption of state authority is "a delicate exercise of legislative policy", [308 U.S. 79, 60 S.Ct. 36] as Mr. Justice Frankfurter says in Palmer v. Massachusetts, supra, and any federal judge would be glad to avoid the decision of problems arising from the existence of dual sovereignty. Here decision cannot be avoided.

The trustees contend that they are compelled by law to invoke the powers of the Interstate Commerce Commission, and to let that body decide the question involved, because what is proposed is an "abandonment". The Public Service Commission contends that it has exclusive authority over the matter, because what is proposed is not an abandonment but "a change in the method of operation of the line and curtailment of service thereon". For what it is worth, the Interstate Commerce Commission has in the past itself exercised jurisdiction over applications to abandon segments of a railroad. Central Railroad of New Jersey Trustees Abandonment, 1945, 261 I.C.C. 810; San Antonio & A. P. Ry. Co. Abandonment, 1931, 180 I.C.C. 119; Central Railroad of New Jersey Trustee Abandonment, report filed March 26, 1948, but not permanently reported in full. It is my notion that the reports of the Interstate Commerce Commission just mentioned have not, nor could have established any general principle, and here, it seems to me, it is for the district court to decide whether in fact the project is to abandon or to curtail service. The physical facts are not the subject of any dispute. In its brief the Public Service Commission refers to the Valley Stream detour as the longer leg of the Rockaway service and the trestle as the shorter leg. While only two stations are proposed to be eliminated (the Raunt and Broad Channel) the so-called shorter leg will be abandoned in every proper sense of the word, and that leg is surely a "portion of a line" of the railroad. It is my conclusion that the trustees' proposal entails "abandonment", and that jurisdiction resides in the Interstate Commerce Commission. It is well to say at this point that the Public Service Commission appears merely as *amicus curiae,* and has expressly declined to participate in any examination of the merits of the trustees' proposal.

I come now to the second preliminary question that must be resolved, namely, assuming that jurisdiction is exclusively with the Interstate Commerce Commission, whether the district court has any right or duty to pass upon questions of public convenience or necessity. On this point I think there is very little difficulty. Judge Swan, writing in In re Fonda, Johnstown & Gloversville Railroad Company, 2 Cir., 1938, 95 F.2d 397, points out that considerations of public interest are adequately protected by the requirement that trustees secure the approval of the appropriate regulatory body before they are permitted to abandon any part of the railroad's facilities. He goes on to say that, 95 F.2d at page 400: " * * * the District Judge need only consider the financial advantages or disadvantages to the debtor corporation's estate in the event that permission to abandon shall be granted by the appropriate regulatory bodies. To have the issue of what the public interest requires determined first by the court and again by the proper administrative commission is a *procedure wasteful of time and expense, and one for which there is no necessity.* We do not construe the statute as contemplating it." (Italics mine.) This decision binds me, even though in a later case, Converse et al. v. Massachusetts, 2 Cir., 1939, 101 F.2d 48, Judge Swan in dissent retracts, 101 F.2d

at page 52, some of the things he said in the Fonda case, supra. That retraction I interpret as follows: in the Fonda case Judge Swan took the position that the trustees of a bankrupt railroad were subject to the action of state, as well as of federal, regulatory bodies. In the Converse case, supra, which was affirmed, sub nom, Palmer v. Massachusetts, cited supra, the court was dealing with a proposed *curtailment* of service. The majority in the Circuit Court believed that reorganization in bankruptcy did not deprive state regulatory bodies of jurisdiction over such matters as curtailment. Judge Swan disagreed, and felt impelled to modify the language he had used in the Fonda case. However, on the point here under discussion, namely, the duty of the district judge in applications of this sort, in my opinion the Fonda case is still law in spite of some language to be found in a decision by Judge Symes at district. In re Denver & Rio Grande Western Railroad Company, D.C.Colo.1940, 32 F.Supp. 244. I feel bound to follow the injunction of Judge Swan that for me to consider public convenience and necessity is a procedure "wasteful of time and expense, and one for which there is no necessity", and moreover that it is a procedure which the applicable statute does not contemplate.[2]

This brings me to the sole question upon which, if I am correct, I ought to pass, namely, the financial advantage or disadvantage to the estate of the trustees' proposed action. As I view the matter, the question of the financial effect of reconstruction upon the estate of the debtor really involves the solution of two subsidiary questions: (1) should the *wooden trestle* be rebuilt, and if not, (2) should some substitute causeway across Jamica Bay be constructed. I suspect that no one seriously contends that the first question should be

answered in the affirmative. I need mention only a few considerations which, in my judgment, would make the reconstruction of the *wooden trestle* a piece of folly. In the first place, even allowing for the insurance, the bankrupt railroad would be required to expend at least $500,000 to rebuild the trestle, because the total cost of reconstruction, as is conceded, is in excess of $1,000,000, and the insurance coverage would in all probability amount to no more than 50% of that sum, and probably less. In addition, as I have already pointed out, fire losses in the last eight years have run to $622,171, and the physical situation of the trestle is such that it is completely vulnerable to fire. The piles are creosoted, as they necessarily must be. No amount of watching will protect against dropped cigar and cigarette ends. At low tide, fire-fighting equipment cannot be brought up to the trestle, and when there is a high wind, as there was on the night of the last fire, the damage is bound to be extensive. I find as a fact, therefore, that the reconstruction of the wooden trestle in kind would involve a serious immediate financial detriment to the debtor's estate (even without consideration of operating losses), and that the trustees ought not to undertake it.

This leaves unanswered the question whether the trustees should erect a substitute facility in the form of a causeway not vulnerable to fire. The facts in connection with this proposal, as I read them, are these: the cost of hydraulic fill, as such, at 60¢ a cubic yard would be $108,000 because 180,000 cubic yards are necessary. To fill and equip the 1,800 feet of burned-out trestle would cost $440,800. If this were interpreted by the insurance fund to be a permanent replacement, the Debtor would receive approximately $400,000 and the deficit arising from the cost of construction

---

2. I can, however, sum up, without comment, the considerations urged by the various civic bodies listed in footnote 1, supra, on the question of public convenience and necessity: (1) loss of time, the estimates varying from 15 minutes to 32 minutes, (2) undue hardship to 47,-000 residents of the area, (3) excessive burdens placed upon the alternative route, (4) inadequate alternative facilities, (5) higher fares, (6) impact of abandonment on leases and property values, (7) loss of summer business and possible removal of large financial interests from the area, and (8) possible elimination of one-day recreation trips to the Rockaway beaches.

(i. e., the amount required to be expended) would be only $50,000. However, a difficulty lies in another direction. To substitute solid fill for the burned-out trestle would require a permit from the Secretary of the Army, and undoubtedly no more than a temporary permit could be secured. And if a plan were devised to make these waters navigable, the permittee would be required to remove the fill. The cost of such removal would be very substantial, amounting to at least as much as the cost of installation of the fill. Of course, it rests wholly in conjecture whether the Army, in the reasonably foreseeable future, would devise and execute a plan for making these waters navigable. It is, however, significant that any projected channel through Grassy Bay would run through the burned-out portion of the trestle, and as one witness said (testifying in opposition to the trustees' petition), the fill would be placed in what is practically the last link in any plan for making these waters navigable. It is significant in this connection that in 1943 the City of New York, evidently anticipating the possibility that it might take over transit facilities in this area, secured the approval of the War Department to the construction of a solid causeway equipped with two bascule bridges, one of them at or close to the burned-out portion of the trestle. It was estimated in 1943 that such a structure would cost some $549,000. But the present cost is well over $1,000,000.

As for the construction-time element, it was agreed on all sides that even a solid causeway could not be placed in operation until at least three months from the time an application was made for a permit. A permit application could not be acted upon by the Army in under one month. From the time construction commenced until safe operation became possible at least two months would elapse. This gives a minimum total of three months, as I have said, from the time the permit is applied for, and in all likelihood the actual time necessary would be closer to six months, because there would have to be a time allowance for unforeseen delays in connection with the permit and for unforeseen difficulties in connection with construction and installation of signal equipment, such as settling of fill.

If solid fill were used for the 1,800 feet of the burned-out portion of the trestle, the fire hazard to the remainder would, of course, still exist.

Up to this point I have said nothing about operating losses or possible savings resulting from elimination of the trestle. The figures for 1949 show a deficit from operation of the Rockaway Branch of $199,792. It is quite possible, as pointed out by the attorney for the Committee for Immediate Restoration of Rail Service, that during the summer alone the branch shows a profit. However, as matters stand, the summer profits and the winter losses must be treated as a unit, and the net result is a substantial loss. But more important than that, the elimination of the trestle would result in a saving of approximately $866,-000, the items being: maintenance of way and structures ($260,372), maintenance of equipment (approximately $180,000), transportation expense (approximately $371,-000), payroll taxes (approximately $30,-000), special franchise tax (approximately $21,000), and real estate taxes (approximately $2,000). These figures, I believe, are not open to challenge; certainly they are not challenged in this record. Naturally there are no figures for savings in the event that solid fill be substituted for the burned-out portion of the trestle, and obviously the savings in connection with such a structure would be somewhat less. But that there would still be a substantial saving is obvious.[3]

On the facts as they were presented to me, therefore, I can only conclude that to substitute solid fill for the burned-out segment of the trestle would be financially an extremely risky enterprise, and there would be a considerable advantage to the estate financially if the trestle in any form could be abandoned. In connection with the risk entailed, I need not repeat what I have said

---

3. Were the trestle to be removed, the estate would realize the amount of $55,408 as net salvage (i. e., gross salvage less removal cost).

above concerning the disadvantage of rebuilding a structure on the basis of a temporary Army permit. It raises, as I have said, questions of what insurance could actually be collected and also imposes upon the estate, or any subsequent reorganized railroad, the possibility that the Army would require the fill to be removed and replaced by a new structure to meet the needs of any plan to make the waters navigable. The financial advantages to the estate produced by abandonment are quite obvious.

I cannot resist observing that questions of financial advantage or disadvantage are inextricably interwoven with questions of public convenience and necessity, which, as I understand the language of the Court of Appeals, I am instructed not to touch. I say this, because any regulatory body which has jurisdiction over the matter (and in this case, as I believe, it is the Interstate Commerce Commission) will decide how far and to what extent public convenience and necessity overrides the financial advantage and disadvantage to the Debtor. I say this, because it is manifest that many segments of the Debtor's railroad can undoubtedly be shown to be operating at a loss. But it is not for me to express any opinion on the bearing which such facts have on the action of any regulatory body, state or federal, or on the final decision to be made. To reiterate the language which I have quoted from the brief of the Public Service Commission, as *amicus* in this proceeding, the final decision that the trestle is not to be rebuilt must be made not by me but by the proper regulatory agents.[4]

The petition is granted, and the trustees have leave to apply to the Interstate Commerce Commission for relief in accordance with the prayer of the petition. The petitions of the Rockaway Chamber of Commerce and of the Committee for the Immediate Restoration of Rail Service to the Rockaways, intervenors, under which an order is sought directing the trustees to rebuild the trestle are denied.

4. In fact, I strongly doubt my power, under the facts disclosed, to order the trustees to rebuild the trestle, or to construct a substitute causeway, which is the prayer of the two formal petitions of intervention. Such an order would necessarily rest upon a finding that the public convenience and necessity transcended the financial disadvantage to the estate of the debtor, which was demonstrated in this proceeding. And yet, under the Fonda case, it is improper and wasteful for a district judge to pass upon such questions. In the only precedents that hasty research has disclosed where a district judge, under circumstances fairly analogous to those at bar, denied the trustees' petition either to abandon or curtail, his order was reversed.