455 F.2d 1205
 In re BOSTON AND MAINE CORPORATION, Debtor (three cases).
Appeal of STATE OF NEW HAMPSHIRE.
Appeal of FRANCONIA PAPER CORPORATION.
Appeal of PRESCOTT LUMBER COMPANY, Inc.
 Nos. 71-1170 to 71-1172.
 United States Court of Appeals,
First Circuit.
 Heard Jan. 4, 1972.
Decided Feb. 17, 1972.
 
 David J. Killkelley, Laconia, N. H., with whom Nighswander, Lord, Martin & Killkelley, Laconia, N. H., was on brief, for Prescott Lumber Company, Inc., appellant.
 Donald W. Stever, Jr., Concord, N. H., attorney, and Martin L. Gross, Concord, N. H., with whom Warren B. Rudman, Atty. Gen., and Sulloway, Hollis, Godfrey & Soden, Concord, N. H., were on brief, for The State of New Hampshire, Franconia Paper Corporation, and Franconia Manufacturing Corporation, appellants.
 Sidney Weinberg, Boston, Mass., with whom Charles W. Mulcahy, Jr., Boston, Mass., was on brief, for appellees.
 Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.
 McENTEE, Circuit Judge.
 
 
 1
 This is a consolidated appeal from the order of the district court, 329 F.Supp. 1394, authorizing the trustees of the Boston and Maine Corporation (B & M) to proceed with abandonment of the railroad line between Lincoln and Concord, New Hampshire. The B & M is a bankrupt railroad in reorganization under Sec. 77 of the Bankruptcy Act (11 U.S.C. Sec. 205). Pursuant to Sec. 77(o), the trustees petitioned the district court for authorization to abandon the line, alleging that abandonment would benefit the railroad's estate and not adversely affect the public interest. Protesting the abandonment were the State of New Hampshire, the Town of Lincoln, and several businesses operating along the line. This appeal was taken by the State and two of the protesting companies, the Franconia Paper Corporation (FPC) and the Prescott Lumber Company (PLC). The Franconia Manufacturing Corporation (FMC), which succeeded to the interests of FPC, has intervened as an appellant.
 
 
 2
 The line between Lincoln and Concord is approximately 71.8 miles in length[1] and is used solely for freight. Although traffic on the line has decreased over the past decade, the line was quite profitable until August 1970.[2] The cause of the financial turnabout was the closing of FPC, which had operated a paper mill in Lincoln. The mill was the line's largest single source of revenue,[3] over half of this being generated by the mill's use of coal for fuel.[4] On July 24, 1970, the mill ceased operations and FPC filed a Chapter XI proceeding. Thereafter, FPC used the railroad only to ship its inventory on hand and bring in minimal amounts of coal to heat the facilities for insurance and resale purposes.
 
 
 3
 The closing of FPC triggered an evaluation of possible abandonment of the line by the officers of the B & M, and on the basis of revenue projections which assumed FPC would not reopen, the trustees petitioned the court.[5] In addition to decreased revenues, the trustees alleged that maintenance on the line which had been deferred could not be delayed further, and therefore maintenance costs would rise sharply over the next five years.[6] At the time of the district court hearing in February 1971, the mill in Lincoln remained closed and, although FPC was negotiating its sale, renewed operations were not imminent. The court authorized the abandonment, based substantially on its conclusion that "[i]t cannot be found at the present time that there is any firm prospect that paper manufacturing will be resumed at the mill in Lincoln. Furthermore, it is doubtful that any future operation of the mill would use coal."
 
 
 4
 Since the date of the court's order the mill has been purchased and reopened by FNC. According to the affidavit of John Potter, its president, renewal of operations began on July 26, 1971, and as of December 13 the mill was operating at 55 percent capacity. In this five month period FMC has used the railraod substantially more than its predecessor for outgoing shipments, and has received carloads of "furnish" materials (chemicals and raw materials) and coal.[7] Solely on the basis of Potter's affidavit, FMC appears to be a viable enterprise. However, the primary source of revenue for the railroad had been its shipments of coal to the mill, and in May 1972 FMC is planning to convert to oil. Whether FMC will receive oil by rail rather than by truck is as yet uncertain, although Potter has stated that the corporation may be willing to pay the higher rail rates to maintain the line in operation. Whether and the extent to which it will in fact do so remain crucial questions, but the resumption of production at the Lincoln mill and the potential use of the railroad by the mill are significant changes in circumstances and likely sufficient to require a new hearing.
 
 
 5
 The balance is tipped in favor of remand for a plenary hearing by the district court's refusal to receive evidence regarding the effect of the proposed abandonment upon the public interest. In so doing the court relied on In re Fonda, J. & G. R. Co., 95 F.2d 397 (2d Cir. 1938) and our citation with approval of that case in Commonwealth of Mass. v. Bartlett, 384 F.2d 819 (1st Cir. 1967), cert. denied, 390 U.S. 1003, 88 S.Ct. 1245, 20 L.Ed.2d 103 (1968). The question in Bartlett was whether the state, in order to exercise its power of eminent domain with respect to real estate owned by a railroad in reorganization, was obliged to obtain the consent of the district court as well as the Interstate Commerce Commission. We held that consent of only the Commission was required. In support of our decision, we observed, at 821 that
 
 
 6
 "[e]ven in the case of the abandonment of a part of the railroad operation at the behest of the trustee under section 77(o), the court's only concern is with the economic effect upon the reorganization, and is not with the consequence to public transportation" because the public interest was to be protected by the Interstate Commerce Commission. For this proposition we cited In re Fonda, J. & G. F. Co., supra. Fonda does, in fact, so hold. However, the Fonda opinion did not quote that section of the statute, and, regrettably, we did not read it ourselves, it not being pertinent to the case before us. Had we read it we would have observed that the Fonda conclusion was in direct contradiction to the statutory language. Section 77(o) (11 U.S.C. Sec. 205(o)) states in so many words that the court's decision permitting abandonment must be "in the interest of the debtor's estate and of ultimate reorganization but without unduly or adversely affecting the public interest." (Emphasis added.) With our attention now focused upon this language we agree not with Fonda, but with the contrary case of In re Denver & R. G. W. R. Co., 32 F.Supp. 244 (D.C.Col.1940).
 
 
 7
 Under the statutory scheme, rail abandonment involves the trustees, the court, and the Commission in a three-step process. First, the trustees decide whether to abandon a line, balancing the economic interests of the railroad against unduly affecting the public interest. Thereafter the district court must determine whether the trustees' decision is justified. Finally, if required by the Interstate Commerce Act, Chapter 1 of Title 49, U.S.C., the court-approved abandonment is presented to the Commission for its approval and authorization. It seems clear to us that if the district court is to consider whether the trustees' abandonment request is justified, it must receive evidence on all aspects of the statutory criteria. The fact that the Commission at the final stage may also consider the possible effect on the public does not excuse the court from determining whether the trustees stuck a proper balance between private and public effects.[8] We regret if our previous dictum misled the district court, but we cannot ignore the clear language of the statute.
 
 
 8
 To avoid repetitive appeals, we deal briefly with several of appellants' remaining contentions.[9] In the threestep process of abandonment, the first step must be taken by the trustees. But there is no prohibition against their reliance on the analyses and recommendations of corporate officers, as was the case here.[10] It is assumed that the trustees exerted their independent judgment. The plenary judicial hearing and determination, with the burden resting upon the petitioning trustees, provide sufficient protection against erroneous conclusions without undue scrutiny of the mental processes of trustee deliberations.
 
 
 9
 The relevant private financial consideration, as stated in the statute, is the effect on the railroad's estate and ultimate reorganization. The length and extent of prior losses are not talismanic, but are merely factors to be considered in determining the reasonable probability of future deficits. Another relevant consideration is whether realistic and practicable methods short of abandonment would make the line profitable, and the trustees' failure to consider such alternatives, if any exist, may weigh against allowing their petition.
 
 
 10
 Included in the past and projected costs of the line's operation are estimates of the cost to the railroad of handling the line's traffic on other branches of the system. Such "beyond line costs," although not susceptible to precise calculation, are properly includable in determinations of the line's profitability. The cost estimate was derived by formula from gross revenue, using a factor of 50 percent.[11] The Interstate Commerce Commission recognizes beyond line costs in both rate and abandonment proceedings. Although the Commission has adopted no single formula for calculating these costs, it has approved the 50 percent calculation in numerous cases, noting its correlation to empirical studies, see Chicago & N. W. Ry. Co. Trustee Abandonment, 230 I.C.C. 645, 649 (1939), and its appropriateness in light of a system's freight operating ratio, see Chicago & N.W. Ry. Co. Abandonment, 275 I.C.C. 759, 775-76 (1951). Where parties disagree on the proper method of ascertaining beyond line costs, the Commission has adopted the commonly accepted 50 percent formula, without explicit foundation, as an equitable approach. Boston & Maine R. Abandonment, 249 I.C.C. 507, 512 (1941). See also New York, N. H. & H. R. Co. Abandonment, 324 I.C.C. 396, 398 (1965). The appellants have suggested no more accurate approach, and in view of its acceptance by the Interstate Commerce Commission in similar circumstances, we do not find adoption of the formula by the district court to be an abuse of discretion. We note, however, that the specific estimate of prospective beyond line costs was based on revenues received when the mill in Lincoln was closed. The mill's reopening may necessitate new calculations.
 
 
 11
 In light of our holding and disposition, no other contentions warrant attention. The order of the district court is vacated and the matter is remanded for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 There is also a short branch at one of the intermediate stops which runs to Franklin Falls, New Hampshire
 
 
 [2]
 Traffic on the line decreased steadily from 6,335 carloads in 1960 to 3,628 carloads in 1969. Notwithstanding this diminution in use, it returned a net profit of $143,500 in 1969 and $66,699 for the first seven months of 1970. The data for August and September of 1970, however, indicate a net loss of $14,560
 
 
 [3]
 In 1969 shipments to and from the FPC mill in Lincoln accounted for $429,416 of the line's total gross revenue of $640,076, or approximately 67 percent
 
 
 [4]
 Of the $429,416 in gross revenues generated by the FPC mill, approximately $249,000 was in the movement of coal
 
 
 [5]
 The trustees projected an annual freight revenue of $159,643 on the assumptions that no revenue would be generated from Lincoln, that the movement of steel for the highway construction of Interstate-93 would terminate, and that revenues from Ashland and Plymouth would be reduced. Other receipts raised the total projected annual revenue to $169,462. Had the revenue from Lincoln been included at its 1969 level, this sum would have been $598,878. With average anticipated annual expenditures of $350,237, the trustees projected an average annual loss of $180,775
 
 
 [6]
 Expenses for the maintenance of way and structures on the line in 1969 totalled $98,025, but were projected to average $147,062 in each of the next five years
 
 
 [7]
 Between July 26, 1971, and December 13, 1971, FMC received 196 carloads of coal and 146 carloads of furnish materials. During this same five month period, allegedly operating at 55 percent of capacity, the mill shipped out 87 carloads of product. In 1969 FPC received 2,054 carloads of materials, mostly coal, and shipped out 84 carloads of product
 
 
 [8]
 The respective roles of the court and the Commission, it should be noted, are quite different under subsection (o) from their roles under other subsections. For example, in the establishment of a reorganization plan the court's role is limited and matters of public interest are deferred to the Commission. Ecker v. Western Pacific R. Corp., 318 U.S. 448, 473, 63 S.Ct. 692, 87 L.Ed. 892 (1943). In that situation the Commission's role precedes chronologically, that of the court. In contrast, abandonment proceedings do not even reach the Commission unless the trustees and the court approve
 
 
 [9]
 Two technical matters which are rendered moot by our remand we mention only in passing. Protestant PLC moved for a continuance to allow for its inspection of the line without a snow cover, which motion was denied. PLC has alleged no specific prejudice from this denial and has had ample opportunity to inspect the line since the court's order. With respect to the testimony and exhibits of witness Hale, although the court's ruling is unclear it appears that his testimony was admitted while the supporting exhibits were not, and thus there was no prejudice. We note incidentally that some responsibility for the clarification of rulings on evidence rests with the attorneys
 
 
 [10]
 The decision of the trustees to petition for abandonment was made on the basis of data and recommendations submitted to them by an officer of the corporation. The trustees apparently conducted no independent investigation of this data, which assumed that there would be no revenues produced at Lincoln and did not mention the effect of the abandonment on the public
 
 
 [11]
 The formula employed herein multiplies the line's pro rata mileage (ratio of number of miles traveled on the line to total number of miles traveled on the system) by the gross revenue generated, subtracts the product (gross revenue credited to the line) from the total gross revenue, and takes 50 percent of the resulting sum as the beyond line cost. For example, if the B & M handled a carload of freight from Mechanicsville, New York, to Lincoln, the total mileage would be 275 miles and the distance traveled on the branch line would be 72 miles. The ratio of 72/275, or 26 percent, is applied to the gross revenue of the shipment, assumed to be $100. The branch line is credited with this amount, $26, which leaves a remainder of $74. Fifty percent of this figure, or $37, is recognized as the beyond line cost